**No. 25-11302**

***In the***

# United States Court of Appeals

***for the***

# Fifth Circuit

---

HUMANA INC. *and* AMERICANS FOR BENEFICIARY CHOICE,

*Plaintiffs-Appellants*,

– v. –

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES;
CENTERS FOR MEDICARE AND MEDICAID SERVICES;
ROBERT F. KENNEDY JR., *in his official capacity as Secretary of Health and Human Services*; MEHMET CENGIZ OZ, *in his official capacity as Administrator of the Centers for Medicare and Medicaid Services*,

*Defendants-Appellees.*

---

On appeal from a final judgment of the
United States District Court for the Northern District of Texas
Case No. 4:25-cv-779 (Chief District Judge Reed O'Connor)

---

**BRIEF FOR PLAINTIFFS-APPELLANTS**

---

EDWARD A. DAY
*Winston & Strawn LLP*
*300 N. LaSalle Drive*
*Chicago, IL 60654*
*(312) 558-8106*

MICHAEL B. KIMBERLY
*Winston & Strawn LLP*
*1901 L Street NW*
*Washington, DC 20036*
*(202) 282-5096*

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF INTERESTED PARTIES

**No. 25-11302**
***Humana Inc., et al. v.***
***U.S. Department of Health & Human Services, et al.***

The undersigned certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case.

**Appellant** Humana Inc. (Humana) is a publicly traded company with no parent corporation. There is no publicly held corporation that owns 10% or more of Humana's stock. Humana is financially interested in the outcome of the case.

**Appellant** Americans for Beneficiary Choice (ABC) is a non-profit, tax-exempt organization incorporated in Texas. It has no parent organization and does not issue stock. ABC is a membership organization representing the interests of insurance agent and brokers, field marketing organizations, and Medicare Advantage enrollees, some of whom are financially interested in the outcome of the case.

**Counsel for appellants** are Michael B. Kimberly and Edward A. Day of Winston & Strawn LLP. Additionally, John T. Sullivan of Winston & Strawn LLP represented appellants in the district court.

/s/ *Michael B. Kimberly*

## STATEMENT REGARDING ORAL ARGUMENT

Appellants respectfully request oral argument.

This appeal presents questions of statutory interpretation—ones not previously resolved by the Court—with respect to the Medicare Advantage (MA) Star Ratings system. The Star Ratings system determines the allocation of billions of dollars in program revenue each year and is the product of a complex regulatory and statutory scheme. This case also presents apparent inconsistencies in agency statements and positions. To resolve the issues presented, the Court will have to evaluate the details of the MA program and Star Ratings system against the backdrop of the facts of this case.

In these circumstances, appellants submit that oral argument would aid the Court's adjudication of this appeal.

## TABLE OF CONTENTS

Introduction .......... 1
Jurisdiction .......... 4
Issues Presented for Review .......... 4
Statement of Facts .......... 5
A. Statutory and regulatory background .......... 5
1. The Medicare Advantage and Part D programs .......... 5
2. The Star Ratings system .......... 8
3. The foreign language interpreter measure .......... 12
B. Factual background .......... 15
1. The disconnected calls (D1100955 and D0900533) .......... 15
2. The silent call (C0701002) .......... 17
3. Post-suit administrative review .......... 19
C. Procedural background .......... 20
Summary of the Argument .......... 22
Argument .......... 26
I. The no-callbacks rule was unlawfully adopted without notice-and-comment rulemaking .......... 26
A. Star Ratings measures may be altered substantively only through notice-and-comment rulemaking .......... 26
1. The regulations and statute require notice-and-comment rulemaking for substantive changes to Star Ratings measures .......... 26
2. The district court's contrary rationales are incorrect .......... 33
B. Because the Accuracy & Accessibility Study implements Section 422.111(h)(1)(iii), CMS may not substantively change the Study without first changing the regulation .......... 40
C. CMS did not comply with its notice-and-comment duties .......... 44
II. The no-callbacks rule is substantively arbitrary .......... 45
III. The silent call should have been invalidated .......... 50
Conclusion .......... 56

# TABLE OF AUTHORITIES

## Cases

*Allina Health Services v. Price*,
863 F.3d 937 (D.C. Cir. 2017)....................8, 31

*Azar v. Allina Health Services*,
587 U.S. 566 (2019)....................8, 31, 45

*Becerra v. Empire Health Foundation*,
597 U.S. 424 (2022).................... 5

*Caris MPI, Inc. v. UnitedHealthcare, Inc.*,
108 F.4th 340 (5th Cir. 2024).................... 6

*Chamber of Commerce v. SEC*,
85 F.4th 760 (5th Cir. 2023).................... 38

*Seth B. ex rel. Donald B. v. Orleans Parish School Board*,
810 F.3d 961 (5th Cir. 2016).................... 36

*Elevance v. CMS*,
736 F. Supp. 3d 1 (D.D.C. 2024)....................11, 32, 39

*Mexican Gulf Fishing v. U.S. Department of Commerce*,
60 F.4th 956 (5th Cir. 2023).................... 45

*Motor Vehicle Manufacturers Association v. State Farm Mutual Autombile Insurance Co.*,
463 U.S. 29 (1983).................... 38

*Public Citizen v. EPA*,
343 F.3d 449 (5th Cir. 2003).................... 46

*Shalala v. Illinois Council on Long Term Care*,
529 U.S. 1 (2000).................... 19

*Texas v. United States*,
40 F.4th 205 (5th Cir. 2022)....................37, 53, 55

**Cases—continued**

*UnitedHealthcare Benefits of Texas v. CMS*,
2024 WL 4870771 (E.D. Tex. 2024) .................................... *passim*

*UnitedHealthcare Insurance Co. v. Becerra*,
16 F.4th 867 (D.C. Cir. 2021) ............................................... *passim*

**Statutes and regulations**

1 U.S.C. § 1 ........................................................................ 35

28 U.S.C.
§ 1291 ........................................................................ 4
§ 1331 ........................................................................ 4, 19
§ 1746 ........................................................................ 51

42 U.S.C.
§ 405 ........................................................................ 4, 19
§ 1395c ........................................................................ 5
§ 1395hh ........................................................................ *passim*
§ 1395kk(a) ........................................................................ 5
§ 1395mm(c)(2)(A) ........................................................................ 37
§ 1395w-22(a) ........................................................................ 5, 6
§ 1395w-23 ........................................................................ *passim*
§ 1395w-24 ........................................................ 6-7, 10-11, 32, 38
§ 1395w-25(d)(2) ........................................................................ 38
§ 1395w-101(a) ........................................................................ 7

42 C.F.R.
§ 422.62(b)(15) ........................................................................ 9, 31, 37
§ 422.111(h)(1) ........................................................................ *passim*
§ 422.160(b) ........................................................................ 9
§ 422.162(b)(1) ........................................................................ 8
§ 422.164(d) ........................................................................ *passim*
§ 422.166(c)(1) ........................................................................ 8, 15
§ 422.260 ........................................................................ 18, 19
§ 422.266(a)(2)(ii) ........................................................................ 10

**Statutes and regulations—continued**

42 C.F.R.—continued
§ 422.502(b)(1)(i)(D) .......... 9, 31
§ 422.510(a)(4)(xi) .......... 32, 39
§ 422.678 .......... 53
§ 423.128(d)(1) .......... 13-14, 33, 41-42
§ 423.180(b) .......... 9
§ 423.182(b)(1) .......... 8
§ 423.186 .......... 8, 16
§ 423.503(b)(1)(i)(D) .......... 10

42 Fed. Reg. 13262 (Mar. 9, 1977) .......... 5

70 Fed. Reg. 4588 (Jan. 28, 2005) .......... 5

75 Fed. Reg. 71190 (Nov. 22, 2010) .......... 10

76 Fed. Reg. 21432 (Apr. 15, 2011) .......... 13

82 Fed. Reg. 56336 (Nov. 28, 2017) .......... 13

83 Fed. Reg. 16440 (Apr. 16, 2018) .......... *passim*

84 Fed. Reg. 15680 (Apr. 16, 2019) .......... 12, 27

86 Fed. Reg. 5864 (Jan. 19, 2021) .......... 11, 13, 29, 33

90 Fed. Reg. 54894 (Nov. 28, 2025) .......... 12, 40

**Other authorities**

A. Scalia & B. Gardner, *Reading Law: The Interpretation of Legal Texts* (2012) .......... 36

*Black's Law Dictionary* (10th ed. 2014) .......... 8, 31

CMS, *Advance Notice of Methodological Changes for Calendar Year (CY) 2027 for Medicare Advantage (MA) Capitation Rates and Part C and Part D Payment Policies* (Jan. 26, 2026) .......... 35

**Other authorities—continued**

CMS, *Medicare 2018 Part C & D Star Ratings Technical Notes* (Sept. 6, 2017) .......... 29

*New Oxford American Dictionary* (2001) .......... 51

*Webster's Third New International Dictionary* (1993) .......... 51

## INTRODUCTION

This case concerns administration of the 2025 Star Ratings system under the Medicare Advantage (MA) and Part D programs. At the center of the case are arbitrary and capricious agency actions of the clearest kind: the Center for Medicare and Medicaid Services (CMS) has subjected Humana and other Medicare Advantage Organizations (MAOs) to an unlawful extra-regulatory policy that was not adopted through notice-and-comment procedures and is arbitrary and capricious on its own terms. In doing so, it has refused to follow its own regulations and guidance. For Humana, one of the nation's largest MAOs, billions of dollars in program revenue hang in the balance.

Each year, CMS calculates and publishes Star Ratings (on a scale of one to five Stars) for each MA and Part D benefit plan. The ratings are intended to reflect plan quality and performance across dozens of underlying quality measures. Star Ratings are centrally important to the MA program: They give the public information about plan quality; provide CMS with data to inform its regulatory and enforcement functions, including determinations concerning plan eligibility; and drive quality bonus payments (QBPs) for well-performing MAOs, which earn greater bonuses as their Star Ratings increase. A plan's QBPs dictate millions, sometimes billions, of dollars in program revenue—revenue that must be used, by law, to lower costs for enrollees or provide them with additional benefits, making the MA program better for everyone.

Among more than three dozen quality measures that drive the Star Ratings each year is one that concerns customer-service call-center performance. By regulation, an MA plan must (1) provide a "toll-free customer service call center" that is open during certain hours and accurately and timely answers enrollees' questions about plan benefits after no more than two minutes of waiting on hold; and (2) make foreign language interpreters available to non-English speaking callers within eight minutes after the caller poses an introductory question in a foreign language. *See* 42 C.F.R. § 422.111(h)(1).

CMS engages a third-party contractor to make "secret shopper" calls to every plan's call center to test compliance with these regulatory requirements. In this case, Humana's Star Ratings declined from 2024 to 2025, largely because CMS scored just three customer-service calls as unsuccessful among hundreds of thousands of calls that Humana fields each year.

Two of the three calls were inadvertently disconnected. If Humana had been permitted to follow its standard customer-service protocol, it would have attempted to remedy the disconnections by calling back—as is standard practice in customer service across industries. But CMS does not allow this; it has adopted an arbitrary no-callbacks rule, requiring MAOs not just to connect callers with interpreters in eight minutes, but to do so in a single call.

This no-callbacks rule is an extra-regulatory policy, and it was adopted without notice-and-comment rulemaking. The rule is also substantively arbi-

trary and capricious because it tests for call drops (which is already evaluated by a different measure) rather than an MA plan's call center's ability to make an interpreter available in eight minutes or less—something that a plan can (and should be able to) accomplish with a simple callback if needed.

The third call at issue in this case involved a secret shopper who remained completely silent for the duration of the six-minute-long call. CMS's regulations are clear, however, that a call center has no obligation to bring an interpreter on the line unless and until the secret caller actually asks a question of the MAO's customer service representative in a foreign language. That did not happen here. CMS's decision to score the call unsuccessful nevertheless—effectively faulting Humana for the secret shopper's silence—was contrary to the agency's regulations and guidance.

On cross-motions for summary judgment, the district court nevertheless upheld CMS's decisions for all three calls. Based on the erroneous conclusions that Star Ratings do not implement CMS regulations, drive quality bonus payments, or determine an MAO's eligibility to participate in the MA program (which they assuredly do), the district court found that the no-callbacks rule need not be promulgated by notice-and-comment rulemaking. The court held further that the rule is not substantively arbitrary and capricious. From there, the court ruled that the silent call was properly scored as unsuccessful under CMS guidance. But in doing so, the court relied on post hoc rationalizations

that the agency did not articulate during the administrative review process and that longstanding precedents hold are off the table at this stage.

The district court's decision wrongfully granted CMS broad authority to disregard its notice-and-comment rulemaking obligations and leeway to selectively enforce its own regulations and guidance. The judgment below, if allowed to stand, will upend how the Star Ratings system, its implementing regulations, and the Medicare statute's notice-and-comment requirement function moving forward. This Court should reverse.

## JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331, or alternatively under 42 U.S.C. § 405(g). The district court entered final judgment in favor of CMS on October 14, 2025. Appellants timely filed a notice of appeal on November 25, 2025. This Court's jurisdiction rests on 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

The questions presented are:

1. Whether the no-callbacks rule is unlawful, requiring Humana's 2025 Star Ratings to be set aside, because it (1) was adopted without notice-and-comment rulemaking or (2) is arbitrary and capricious on its merits.

2. Whether CMS's refusal to invalidate the silent call was arbitrary and capricious, requiring Humana's 2025 Star Ratings to be set aside, because the secret caller never posed an introductory question in a foreign language.

## STATEMENT OF FACTS

### A. Statutory and regulatory background

#### *1. The Medicare Advantage and Part D programs*

**a.** The Medicare program provides federally funded insurance to Americans who are 65 and older, have received federal disability benefits for at least 24 months, or have end-stage renal disease. *See Becerra v. Empire Health Foundation*, 597 U.S. 424, 428–29 (2022); 42 U.S.C. § 1395c. The Medicare program is administered by CMS on behalf of the Secretary of HHS. 42 U.S.C. § 1395kk(a); Health Care Financing Administration Reorganization Order, 42 Fed. Reg. 13262 (Mar. 9, 1977).

Medicare comprises Parts A, B, C, and D. *See* Medicare Program; Establishment of the Medicare Advantage Program, 70 Fed. Reg. 4588, 4589 (Jan. 28, 2005). Part A covers inpatient hospital treatment, and Part B covers outpatient services. Together, Parts A and B are known as "traditional" or "original" Medicare. Traditional Medicare uses a fee-for-service payment model. *See* 42 U.S.C. § 1395w-22(a)(1). Under this model, CMS reimburses providers directly for the services they provide to Medicare beneficiaries. *UnitedHealthcare Insurance v. Becerra*, 16 F.4th 867, 872–73 (D.C. Cir. 2021).

Medicare Part C, also known as Medicare Advantage or MA, uses a different model. *See generally* Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, 117 Stat. 2066 (codified at

42 U.S.C. §§ 1395w-21 to 1395w-28). The program avoids the pitfalls of traditional Medicare and its single-payer, one-size-fits-all approach by offering plans sponsored by private companies called Medicare Advantage organizations, or MAOs—like appellant Humana. These companies must cover at least the same services that Medicare beneficiaries would receive through traditional Medicare. 42 U.S.C. § 1395w-22(a). But to attract enrollees, MA plans typically offer additional benefits not covered by traditional Medicare, such as dental and vision insurance. *See UnitedHealthcare*, 16 F.4th at 872.

Under this public-private model, MAOs do not receive fee-for-service reimbursements from CMS for the healthcare services their enrollees receive. *See generally* 42 U.S.C. § 1395w-23(a). Instead, they receive a monthly, risk-adjusted, per-enrollee payment to provide coverage for all Medicare-covered benefits to the beneficiaries enrolled in their plans. *Id.* § 1395w-23(a)(1)(A). In turn, MAOs pay healthcare providers for the services they provide to MA enrollees. *See UnitedHealthcare*, 16 F.4th at 873; *Caris MPI, Inc. v. UnitedHealthcare, Inc.*, 108 F.4th 340, 343–44 (5th Cir. 2024).

CMS determines a plan's monthly payment by comparing the plan's "bid," which is its estimated cost of providing Medicare-covered services to a particular patient population (42 U.S.C. § 1395w-24(a)), to a "benchmark," which is the amount the federal government estimates it would pay for coverage under traditional Medicare (*id.* § 1395w-23(b)(1)(B), (n)). If the MAO's

bid is below the benchmark, CMS pays the MAO its bid and returns a percentage of the difference between the benchmark and the bid as a "rebate," which must be used to provide additional benefits or to lower premiums or copays. *Id.* §§ 1395w-23(a)(1)(B)(i), (E), 1395w-24(b)(1)(C).

In addition to inpatient treatment and outpatient services, MA beneficiaries may obtain prescription drug coverage through Medicare Part D. Like the MA program, the Part D program provides coverage through a public-private partnership with plan sponsors, using the same bid-benchmark process. 42 U.S.C. § 1395w-101(a)(1), (3)(C).

**b.** The MA statute incorporates a special rulemaking provision, codified at 42 U.S.C. § 1395hh(a)(2). That provision specifies that

> No rule, requirement, or other statement of policy (other than a national coverage determination) that establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under this subchapter shall take effect unless it is promulgated by the Secretary by regulation under paragraph (1).

Paragraph (1), in turn, states that "The Secretary shall prescribe such regulations as may be necessary to carry out the administration of the insurance programs under this subchapter."

Thus, under Section 1395hh(a)(2), any "substantive legal standard" that governs "payment for services" or the eligibility of MAOs or beneficiaries "to furnish or receive services or benefits" under the MA or Part D programs

must proceed through notice-and-comment—even rules that might be classified under the APA as mere interpretive policy statements. *Azar v. Allina Health Services*, 587 U.S. 566, 568 (2019). "A 'substantive legal standard' at a minimum includes a standard that 'creates, defines, and regulates the rights, duties, and powers of parties.'" *Allina Health Services v. Price*, 863 F.3d 937, 943 (D.C. Cir. 2017), *aff'd*, 587 U.S. 566 (2019) (quoting Black's Law Dictionary (10th ed. 2014)).

### *2. The Star Ratings system*

**a.** The Medicare statute prescribes a system of "quality rating[s]" for MA plans using a "5-star rating system" that is based on the data collected under MAOs' quality improvement programs. 42 U.S.C. § 1395w-23(o)(4); *see also* 42 C.F.R. §§ 422.162(b)(1), 423.182(b)(1); CMS, Contract Year 2019 Policy & Technical Changes to the Medicare Advantage Program, 83 Fed. Reg. 16440, 16520 (Apr. 16, 2018).

CMS evaluates plans across dozens of quality and compliance measures. Each plan receives a numerical score on each applicable measure, which CMS converts into a "measure-level" Star Rating. From the measure-level Star Ratings, CMS calculates Part C and Part D "summary" ratings, which reflect the weighted average of a plan's measure-level Star Ratings. 42 C.F.R. §§ 422.166(c)(1), 423.186(c)(1).

The Star Ratings system is integral to the MA and Part D programs. It serves three primary functions, each of which requires the ratings to "accurately . . . reflect true performance." 83 Fed. Reg. at 16519.

***First***, the system is designed to provide Medicare beneficiaries with "comparative information on plan quality and performance," allowing them to make "knowledgeable enrollment and coverage decisions in the Medicare program." 42 C.F.R. §§ 422.160(b)(1), 423.180(b)(1). As CMS has explained, "[t]he MA and Part D Star Ratings systems is designed to provide information to the beneficiary that is a true reflection of the plan's quality and encompasses multiple dimensions of high quality care," with the goal of "inform[ing] plan choice" by beneficiaries. 83 Fed. Reg. at 16520.

***Second***, the system is designed to help CMS perform "oversight, evaluation, and monitoring of MA and Part D plans" and compliance with regulatory and contract requirements. 83 Fed. Reg. at 16520–21; *see also* 42 C.F.R. §§ 422.160(b)(3), 423.180(b)(3). For that reason, CMS conditions certain aspects of a plan's status within the MA program on its Star Rating. For example, only plans with a Star Rating of 5.0 Stars may enroll beneficiaries outside of the Annual Enrollment Period. *See* 42 C.F.R. § 422.62(b)(15). And CMS may kick an MA plan or Part D plan out of the program altogether if it "[r]eceived any combination of Part C or D summary ratings of 2.5 or less in

both of the two most recent Star Rating periods." *Id.* §§ 422.502(b)(1)(i)(D), 423.503(b)(1)(i)(D).

***Third,*** the Star Ratings system is used in administering quality bonus payments, or QBPs. *Id.* § 422.160(b)(2). These payments were established in 2010 by the Patient Protection and Affordable Care Act. *See* Proposed Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs for Contract Year 2012, 75 Fed. Reg. 71190, 71218 (Nov. 22, 2010). The Act provides that an MA plan is entitled to QBPs from CMS depending on the "quality rating" of the plan, which "shall be determined according to a 5-star rating system." 42 U.S.C. § 1395w-23(o)(4)(A).

QBPs influence an MA plan's rebate in two ways. First, if an MA plan receives a Star Rating of 4.0 Stars or higher, its benchmark is raised, increasing the difference between the bid and the benchmark. *Id.* § 1395w-23(o)(1), (3)(A). Second, as Star Ratings increase so does the percentage of the difference between the bid and benchmark that is returned as a rebate: Plans with a 4.5 Star Rating or higher receive a rebate equal to 70% of the difference between the bid and the benchmark; plans with a rating between 3.5 and 4.5 Stars receive a 65% rebate; and plans with a rating under 3.5 Stars receive a 50% rebate. *Id.* § 1395w-24(b)(1)(C)(v); 42 C.F.R. § 422.266(a)(2)(ii). In total, by driving up its QBPs, a plan with 4.5 Stars might receive a rebate almost twice as large as an otherwise similarly situated plan with 3.5 Stars.

Plans receiving QBPs must use them to provide additional supplemental benefits to enrollees or return them to enrollees through lower premiums or lower copays and coinsurance. 42 U.S.C. §§ 1395w-23(a)(1)(B)(i), (E), 1395w-24(b)(1)(C). The Star Ratings thus have a tremendous impact on an MAO's standing in the marketplace and the plan revenue it receives to provide richer benefits.

**b.** "When the Star Ratings [system] was first introduced, it was not codified in the Code of Federal Regulations." *Elevance v. CMS*, 736 F. Supp. 3d 1, 6 (D.D.C. 2024). "Instead, CMS used its authority to disseminate information to beneficiaries as the basis for developing and publicly posting the 5-star ratings system." *Id.* (citing 83 Fed. Reg. at 16520).

In later contract years, "CMS decided to formalize the Star Ratings" by promulgating a series of regulations establishing "the methodology that CMS uses each year to calculate the ratings" (*id.*), which it did citing its Section 1395hh(a)(2) rulemaking obligations (*see, e.g.*, CMS, Contract Year 2022 Policy and Technical Changes to the Medicare Advantage Program, 86 Fed. Reg. 5864, 6094 (Jan. 19, 2021)).

CMS formalized the requirement for notice-and-comment rulemaking, and thereby implemented 42 U.S.C. § 1395hh(a)(2) with respect to Star Ratings measures, with 42 C.F.R. § 422.164(d). That provision specifies that, "[f]or measures that are already used for Star Ratings, CMS will update

measures so long as the changes in a measure are not substantive" through the informal notice process that applies to "changes in and adoption of payment and risk adjustment policies in section 1853(b) of the Act." *Id.* § 422.164(d)(1). But "in the case of measure specification updates that are substantive" in nature, "CMS will propose and finalize these measures through rulemaking similar to the process for adding new measures." *Id.* § 422.164(d)(2). *Accord* CMS, Contract Years 2020 and 2021 Policy and Technical Changes to the Medicare Advantage Program, 84 Fed. Reg. 15680, 15749 (Apr. 16, 2019) ("Going forward CMS must propose through rulemaking any . . . substantive measure changes.").[1]

#### *3. The foreign language interpreter measure*

**a.** This case concerns the so-called Foreign Language Interpreter and TTY Availability Measure, a measure that CMS uses to score plans' compli-

---

[1] Although measures are adopted, altered, or removed through formal rulemaking, "CMS does not codify a list in regulation text of the measures (and their specifications) adopted for the Part C and Part D Star Ratings program." CMS, Contract Year 2027 Policy and Technical Changes to the Medicare Advantage Program, 90 Fed. Reg. 54894, 54965 (Nov. 28, 2025). It instead "lists the measures used for the Star Ratings each year in the Medicare Part C & D Star Ratings Technical Notes" (*id.*), which are incorporated into the Federal Register by reference. *See, e.g.*, CMS, Contract Year 2019 Policy and Technical Change to the Medicare Advantage Program, 82 Fed. Reg. 56336, 56386 (Nov. 28, 2017) (explaining that "[t]he measure descriptions listed" in each Federal Register notice "are high-level descriptions," and the "Medicare Part C & D Star Ratings Technical Notes[] provides detailed specifications for each measure"). *See* ROA.473–550; ROA.779.

ance with 42 C.F.R. § 422.111(h)(1)(iii). Section 422.111(h)(1)(iii) was first adopted in 2011 (76 Fed. Reg. 21432, 21502–03 (Apr. 15, 2011)) and substantially amended in 2021 (86 Fed. Reg. at 6006).

Relevant here is the specific requirement, added in the 2021 update, that call centers make foreign language interpreters available on incoming customer-service calls "within 8 minutes of reaching the customer service representative" for a minimum of "80 percent of incoming calls requiring an interpreter." 42 C.F.R. §§ 422.111(h)(1)(iii), 423.128(d)(1)(iii).[2]

The Foreign Language Interpreter Measure reports the results of the Accuracy & Accessibility Study, which is one element of CMS's secret shopper test call program. The Technical Notes for the Accuracy & Accessibility Study were updated in 2022, to conform to the detailed 2021 updates to 42 C.F.R. §§ 422.111(h)(1) and 423.128(d)(1). ROA.779. The Technical Notes confirm that the Accuracy & Accessibility Study is designed "to determine if the services were compliant with 42 C.F.R. §§ 422.111(h)(1)(iii) and 423.128-(d)(1)(iii)," as amended. ROA.808.

---

[2] The standards enumerated at 42 C.F.R. § 422.111(h)(1) govern MA plans, and those enumerated at § 423.128(d)(1) govern Medicare Part D prescription drug plans. The provisions are identical in all relevant respects. Although both provisions are relevant here, we more often cite to § 422.111(h)(1) alone for simplicity's sake—but when we do so, we mean it as shorthand for both.

**b.** According to CMS guidance, a secret shopper call must proceed in four phases: (1) dial, (2) connect, (3) introductory question, and (4) accuracy measure. ROA.782. Only the first three steps are relevant here. *See United-Healthcare Benefits of Texas v. CMS*, 2024 WL 4870771, at *3–5 (E.D. Tex. 2024). These phases proceed as follows:

- At phase 1 ("dial"), secret shoppers must dial the center's toll-free or alternate toll-free calling information. ROA.782.
- At phase 2 ("connect"), secret shoppers must "determine if [they] can reach a live CSR." *Id.* A call will be marked unsuccessful at this phase if the call center is closed when it should be open, if a "technology barrier" such as a busy signal prevents the connection, or if the wait time exceeds 10 minutes. ROA.782–83.
- At phase 3 ("introductory question"), the secret shopper must speak in a foreign language "and wait for the CSR to bring an interpreter to the phone." ROA.783. Once the interpreter is on, the caller must pose an introductory question and "the CSR, via an interpreter, [must provide] an affirmative response to the introductory question." *Id.* Phase 3 must be completed within 8 minutes of the initial connection.

"A call is considered connected when the caller confirms that the call connects" verbally to the customer service representative (or CSR), and "[t]he measure is considered completed when contact has been established with an interpreter and the introductory question has been correctly answered within eight minutes of reaching [the] CSR." ROA.788 (boldface omitted).

The Accuracy & Accessibility Study scores calls in one of three categories: successful, unsuccessful, or invalidated. *See* ROA.782–783. Invalidated

calls are excluded from the study and do not consider for purposes of the Star Ratings scores. *See, e.g.*, ROA.796, ROA.806. Invalidating calls is routine; for 2025, CMS invalidated four of Humana's calls. *See* ROA.424.

**c.** This case concerns the no-callbacks rule under the Accuracy & Accessibility Study. According to that rule, "CMS does not allow callbacks from the plan," and "all questions [must] be answered in a single call." ROA.740. In other words, callbacks are not permitted following a call disconnection, even when it would be possible using a callback to connect the caller with an interpreter in under eight minutes following the initial connection. If an MA plan attempts a callback, it receives an automated message: "We're sorry, your call cannot be completed at this time. Please hang up and try your call again later." ROA.167. The no-callbacks rule is not stated in agency guidance and has not been adopted through notice-and-comment rulemaking.

## B. Factual background

At issue here are three calls CMS scored as "unsuccessful" in the 2025 Accuracy & Accessibility Study. These errors negatively impacted Humana's Star Ratings for several of its largest contracts.

### *1. The disconnected calls (D1100955 and D0900533)*

CMS scored two of the calls placed to Humana customer service representatives at issue here (D1100955 and D0900533) as unsuccessful because the calls disconnected. *See* ROA.721–22.

Humana challenged the two dropped calls in an informal administrative process through which MAOs can review, comment on, and challenge the agency's preliminary determinations with respect to each measure. *See* 42 C.F.R. §§ 422.166(h)(2), 423.186(h)(2). It explained that it "was unable to complete these calls due to technical limitations imposed by the CMS study that do not exist when Humana CSRs engage with actual Medicare beneficiaries." ROA.722. In particular, "Humana's standard calling system and process for prospective members allows for Humana to call a prospective member back in the event of a dropped call," as is standard practice for customer service across industries. *Id.* Yet "CMS would not accept a call back attempt." *Id.* Humana explained that the no-callbacks rule was inconsistent with the Technical Notes, which provide that "the interpreter and the CSR [must be] able to answer questions about the plan *within eight minutes*," without regard for whether it is in a single call. *Id.*

Humana also argued that it made no sense for the Accessibility study to penalize plans for call drops because the Call Center Monitoring Program's Timeliness Study separately (and by design) measures disconnect rates. *See id.* Automatically scoring an initially disconnected call as unsuccessful under the Accuracy & Accessibility Study without allowing the MA plan to perform a callback effectively "double count[s] technical call drop issues" while

artificially preventing plans from meeting the eight-minute requirement for interpreters using callbacks. *Id.*

Without evaluating Humana's position itself, CMS forwarded the protest to the private contractor that it had retained to monitor plan call center performance, Hendall Inc. ROA.725; *see* ROA.768. The contractor stated, "We do not allow callbacks from the plan as all questions should be answered in a single call." ROA.729. In subsequent correspondence with Humana, CMS copied-and-pasted the contractors' analysis: "CMS does not allow callbacks from the plan as all questions should be answered in a single call." ROA.740. CMS did not cite any source as support for the asserted policy. Nor did it otherwise engage with the substance of Humana's arguments.

#### ***2. The silent call (C0701002)***

CMS identified a third call (C0701002) as unsuccessful in which the secret shopper never spoke; the caller remained silent for the duration. *See* ROA.705. The secret shopper's notes suggest that he mistakenly believed he was on a "silent" hold and therefore did not speak. *Id.* After an extended period of silence with no communication, the call was disconnected. *Id.*

Humana challenged the unsuccessful score for call C0701002 through the informal review process. It explained that "[t]he CMS caller remained silent throughout the duration of the call" and noted that CMS guidance provides that "[a] call is considered *connected* when the caller confirms that the

call connects to the CSR" verbally. *Id.* Here, however, the CMS caller "did not attempt any communication whatsoever, and thus never confirmed that the call was connected to the CSR." *Id.* This "strongly indicates a mistake was made by the CMS caller or the vendor CMS used to perform the call." *Id.* Humana thus argued the call should not "be considered connected" and should instead be "excluded" from the Star Ratings calculation. *Id.*

CMS again forwarded the protest to Hendall (ROA.707), which recommended denying the protest because "[t]he CMS caller dialed the correct number and connected with the plan, however before the CMS caller could make contact with the CSR the call disconnected." ROA.710. CMS "agree[d] with keeping the call as is." ROA.714. CMS copied-and-pasted the contractor's response to Humana, adding only that "it is not unusual for the interviewer to remain silent while waiting for a CSR as they would not understand anything being presented in English." ROA.717.

Humana repeated its objections to the treatment of calls C0701002, D1100955, and D0900533 in later correspondence with the agency during later stages of the plan preview period, elaborating on the arguments previously made. *See* ROA.422–424. CMS responded only that it had "reviewed closely with the team" and would "not be making any changes that would impact the Stars that will [be] released on or around 10/10." ROA.426.

CMS issued the final 2025 Star Ratings on October 10, 2024. The determination of the 2025 Star Ratings was at that point final and effective.

### *3. Post-suit administrative review*

Humana and ABC filed suit, challenging the no-callbacks rule and misscoring of the silent call, among other things. *See Humana Inc., et al. v. HHS, et al.*, No. 4:24-cv-1004-O (N.D Tex). At the same time, Humana commenced an optional internal agency review of its QBP allotment pursuant to 42 C.F.R. § 422.260, raising the same arguments it had presented in the lawsuit.

The district court dismissed the complaint for lack of exhaustion, as required (in the district court's view) by 42 U.S.C. § 405(g). The district court held that Humana had to await completion of the optional and discretionary administrative review process before bringing suit in district court, which it was required to commence under 42 U.S.C. § 405(g) and not 28 U.S.C. § 1331. *See Humana Inc., et al. v. HHS, et al.*, No. 4:24-cv-1004-O, Dkt. 56.[3]

[3] The district court's exhaustion holding was, respectfully, wrong. Section 405 exhaustion applies only to claims that can (and must) be presented initially to an administrative law judge under Section 405(b). *See Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 20 (2000) (explaining that Section 405(g)'s reference to a "hearing" means a hearing before an administrative law judge under Section 405(b)). Such proceedings typically include claims by Medicare beneficiaries for coverage or by providers for payment. A claim challenging CMS's Star Ratings calculations is not reviewable under Section 405(b), and no Star Ratings determination has ever been reviewed under that provision. A Star Ratings challenge therefore is not a claim subject to the channeling requirements of Section 405(g) and (h).

By the time the district court dismissed for failure to exhaust, the optional Section 422.260 review proceedings were concluded. The CMS Hearing Officer affirmed the denial of Humana's request for reconsideration of its Star Ratings and QBPs. ROA.160–62. After describing the parties' arguments, the CMS Hearing Officer stated simply: "I find that Humana has not demonstrated by a clear and convincing evidence standard that CMS has erred in its determinations. . . . In the case of the calls at issue, CMS provided evidence, through call logs and notes, that attempts were validly made, yet contacts were not completed as outlined in the Technical Notes." ROA.161–62. No further explanation was given.

### C. Procedural background

Humana and ABC filed this second action under the APA and the Medicare statute, seeking invalidation of the no-callbacks rule and asking the court to set aside Humana's 2025 Star Ratings.

Relevant to this appeal, plaintiffs alleged that CMS's no-callbacks rule is unlawful because it was not adopted through notice-and-comment rulemaking, and is arbitrary and capricious because it evaluates plan features and conduct unrelated to 42 C.F.R. § 422.111(h)(1)(iii). *See* ROA.24–27 (¶¶ 84–96). Plaintiffs also alleged that CMS's decision to score the silent call "unsuccessful" was inconsistent with its own guidelines and requirements, such that its

refusal to invalidate the call when Humana objected during the plan preview period was arbitrary and capricious. *See* ROA.27–28 (¶¶ 100–105).

The parties cross-moved for summary judgment.

The district court denied plaintiffs' motion and granted CMS's. The court first concluded that the no-callbacks rule is not subject to notice-and-comment requirements under the Medicare statute or the APA. ROA.1322–25. On this front, the court rejected appellants' argument that the policy is a substantive change to the Foreign Language Interpreter Measure, and thus a de facto amendment of 42 C.F.R. § 422.111(h)(1)(iii). As the district court saw it, "Humana brings a challenge under the Star Ratings—not a compliance challenge under the . . . regulation." ROA.1322–23.

The court did not address plaintiffs' argument that notice and comment was required by 42 C.F.R. § 422.164(d)(2).

The court rejected appellants' contention that the no-callbacks rule must be promulgated by notice and comment under 42 U.S.C. § 1395hh(a)(2). It held that QBPs are not "payments for services" (ROA.1323) and that the Star Ratings, while they may "influence" eligibility, do not "govern" MAO's eligibility to participate in the program (ROA.1324–25).

The district court further held that the no-callback policy is not substantively arbitrary, finding there was a "rational relationship" between the policy and "the Star Ratings' goal of evaluating the service quality provided by an

MAO's call center." ROA.1327–28. On these grounds, the district court declined to invalidate the no-callbacks rule or set aside Humana's 2025 Star Ratings. ROA.1328.

Concerning the silent call, the district court held that CMS's decision to code that call as unsuccessful was not arbitrary or capricious because it was consistent with CMS guidance. ROA.1328–29. The district court also *sua sponte* held that CMS may score a call unsuccessful if a plan disconnects a call for any reason, at any time (ROA.1329), or if the secret shopper is "not able to connect to a live CSR at the plan during that scheduled call" (*id.*). The court reasoned that silence prevented the secret shopper from confirming there was a live CSR on the line to satisfy the "connect" stage. ROA.1329–30. It thus denied relief as to the silent call.

## SUMMARY OF THE ARGUMENT

**I.** The no-callbacks rule was adopted without notice-and-comment rulemaking required by law, and it therefore should be invalidated. There are two related analytical paths by which to conclude that the no-callbacks rule must be adopted through notice-and-comment rulemaking.

**A.** The first path relies on 42 C.F.R. § 422.164(d)(2), which specifies that "substantive updates" to "measures that are . . . used for Star Ratings" shall be adopted "through rulemaking similar to the process for adding new measures." The no-callbacks rule substantively updates the Foreign Language

Interpreter Measure with a new single-call requirement, and it therefore had to be adopted using notice-and-comment under Section 422.164(d)(2).

We made this point in the briefing below, but the district court declined even to cite Section 422.164(d)(2), let alone explain why it does not apply. CMS, for its part, argued below that the no-callbacks rule is not substantive within the meaning of Section 422.164(d)(2), but that is not credible. On this basis alone, the Court should conclude that the no-callbacks rule had to be adopted, if at all, through notice-and-comment rulemaking.

**B.** The second path turns on the fact that the Foreign Language Interpreter Measure and its underlying Accuracy & Accessibility Study (the secret shopper protocol that CMS uses to test call centers) are expressly designed to implement and enforce 42 C.F.R. § 422.111(h)(1)(iii), which codifies the interpreter requirement and the eight-minute rule. For CMS to use the Foreign Language Interpreter Measure and Accuracy & Accessibility Study to test compliance with binding standards not appearing in the text of Section 422.111(h)(1)(iii) is for the agency to amend the regulation de facto, which requires notice and comment. That is what the no-callbacks rule does.

The district court rejected the notion that the Accuracy & Accessibility Study implements Section 422.111(h)(1)(iii). But CMS has repeatedly taken the opposite view. And the fact that a plan can meet the minimum requirements set by Section 422.111(h)(1)(iii) and still earn "a Star Rating lower than

5.0" does not mean that that the Foreign Language Interpreter Measure doesn't enforce that provision. A regulatory program that penalizes regulatory non-compliance and rewards performance above the regulatory minimum is rightly understood to enforce the regulation. Just so here.

**C.** The no-callbacks rule was promulgated without notice-and-comment and therefore is unlawful. Because affected members of the public received no chance to comment before CMS implemented the no-callbacks rule, the rule cannot stand. Neither can Humana's 2025 Star Ratings, which were adversely affected by the no-callbacks rule.

**II.** The no-callbacks rule is unlawful because it is substantively arbitrary and capricious. First, it bears no rational connection to the objectives of the Foreign Language Interpreter Measure and Accuracy & Accessibility Study, nor to the purposes of 42 C.F.R. § 422.111(h)(1)(iii). It requires counting bare call disconnections against MA plans, even when such disconnections would not prevent a plan from complying with the eight-minute requirement using a callback. It thus interferes with plans' ability to meet the requirements of the regulation using industry standard practices.

Moreover, by testing for bare call disconnections—a feature the Foreign Language Interpreter Measure and Accuracy & Accessibility Study are not designed to evaluate—the no-callbacks rule double-weights the effect of its call center's tendency to drop calls, which are separately (and by design) measured

by the Timeliness Study and factored into the distinct "Calls Disconnected When Customer Calls Health Plan" measure. To enforce the no-callbacks rule so that it penalizes MA plans for bare call disconnections under the Foreign Language Interpreter Measure, as well, is to double-weight call disconnections using two measures. That is arbitrary and capricious.

**III.** The district court erred in finding that CMS's decision to mark the silent call unsuccessful was lawful. The administrative record shows that the secret shopper did not speak in a foreign language, a necessary step for a call to be considered "connected" under CMS guidance. The secret shopper failed to do so because she mistakenly believed she was on a silent hold. The regulations, guidance, common sense, and the Eastern District of Texas's *UnitedHealthcare* decision all confirm that CMS should have invalidated the call. Humana's CSR was under no duty to engage the secret shopper until the secret shopper spoke. The district court's decision to uphold the agency's scoring of the call did not fully address plaintiffs' arguments or cited authority and misapplied CMS's guidance. Evaluated properly, the silent call should have been invalidated.

## ARGUMENT

CMS has subjected Humana and other MAOs to the no-callbacks rule, an unlawful extra-regulatory policy that was not adopted through notice-and-comment procedures as required by law, and which is arbitrary and capricious on its own terms. In doing so, it has refused to follow its own regulations and guidance—just as it has done in counting against Humana a call in which the secret shopper remained entirely silent. Reversal is manifestly in order.

### I. THE NO-CALLBACKS RULE WAS UNLAWFULLY ADOPTED WITHOUT NOTICE-AND-COMMENT RULEMAKING

There are two avenues for concluding that the no-callbacks rule must be adopted through notice-and-comment rulemaking. By either path, notice and comment was required. And because the no-callbacks rule was adopted without notice and comment, it is unlawful and may not be enforced.

#### A. Star Ratings measures may be altered substantively only through notice-and-comment rulemaking

##### *1. The regulations and statute require notice-and-comment rulemaking for substantive changes to Star Ratings measures*

CMS's own regulation—42 C.F.R. § 422.164(d)(2)—and authoritative statements in preambles to other rulemakings state plainly that substantive changes to Star Ratings measures must proceed through notice-and-comment rulemaking. The text of 42 U.S.C. § 1395hh(a)(2) confirms the same.

**a.** CMS regulations contemplate two distinct categories of changes that the agency may make to "measures that are already used for Star Ratings." 42 C.F.R. § 422.164(d). In the first category are "changes in a measure [that] are *not* substantive." *Id.* § 422.164(d)(1) (emphasis added). In the second category are "measure specification updates that are substantive updates not subject to paragraph (d)(1)." *Id.* § 422.164(d)(2).

Non-substantive changes covered by paragraph (d)(1) may be adopted "through the [informal] process described for changes in and adoption of payment and risk adjustment policies," codified at 42 U.S.C. § 1395w-23(b)(2). *See* 42 C.F.R. § 422.164(d)(1). Substantive changes under paragraph (d)(2), in contrast, must be "propose[d] and finalize[d] . . . through rulemaking similar to the process for adding new measures," which calls for notice-and-comment. *See id.* § 422.164(d)(2); 84 Fed. Reg. at 15749 ("CMS must propose through rulemaking any . . . substantive measure changes.").

Paragraph (d)(1) defines the kinds of changes that are non-substantive. It states that "[n]on-substantive measure specification updates" not subject to formal notice-and-comment include updates to "clinical codes" that do not affect "the intent of the measure"; certain process "clarifications," such as any bearing on "documentation requirements" and "instructions [for] identify[ing] services or procedures" relevant to the measure; and other changes that "[d]o not meaningfully impact the numerator or denominator of the

measure." 42 C.F.R. § 422.164(d)(i)–(v).

Substantive changes are those that materially impact a measure's numerator and denominator, thus changing a plan's score. *Id.* For the Foreign Language Interpreter Measure, the numerator is the number of successful secret shopper calls that a plan has in a given year, and the denominator is the total number of non-invalidated calls that year. *See* ROA.361, ROA.787. Any change that meaningfully impacts those numbers is substantive.

In the preamble to the rule adopting Section 422.164(d), CMS explained further that a "change [to] the nature of the measure," or one that affects a measure's "methodology or specifications," is substantive and must "be proposed and finalized through rulemaking" under paragraph (d)(2). *See* 83 Fed. Reg. at 16534.

**b.** The no-callbacks rule is a substantive update to the Foreign Language Interpreter Measure within the meaning of Section 422.164(d)(2). CMS first adopted the measure in 2018. *See* 83 Fed. Reg. at 16543. In the preamble to the 2018 rulemaking, CMS gave a "high-level description[]" of each of the Star Ratings measures and explained that "detailed specifications" for each were provided in the "Technical Notes document," which was incorporated into the rulemaking record as a "supporting document." *Id.* at 16538.

The then-current Technical Notes document described the Foreign Language Interpreter Measure as scoring the "[p]ercent of time that TTY services

and foreign language interpretation were available when needed by prospective members who called the health plan's prospective enrollee customer service phone number." CMS, *Medicare 2018 Part C & D Star Ratings Technical Notes* 56 (Sept. 6, 2017), https://perma.cc/AP92-UCVS; *accord* ROA.902. It specified that "[i]nterpreters must be able to communicate responses to the call surveyor in the call center's non-primary language about the plan sponsor's Medicare benefits" and explained that "[s]uccessful contact with an interpreter is defined as establishing contact with an interpreter and beginning the first of three survey questions." *Medicare 2018 Part C & D Star Ratings Technical Notes*, *supra* at 56. The specifications did not address the permissibility of callbacks or otherwise require call centers to make contact with an interpreter in a single call only.

In 2021, CMS promulgated an update to the regulation governing the foreign language interpreter requirement (42 C.F.R. § 422.111(h)(1)), formally codifying several standards previously furnished only in guidance, including the requirement that an interpreter be made available in eight minutes of initial contact with a CSR. *See* 86 Fed. Reg. at 6006.

After finalizing the 2021 rule, CMS updated the Technical Notes for the Accuracy & Accessibility Study, along with the annual agency memoranda, to conform to the new eight-minute rule. *See* ROA.779. Once again, however, the specifications for the Foreign Language Interpreter Measure and its under-

lying Accuracy & Accessibility Study were silent on the supposed need to connect callers with an interpreter in under eight minutes *in a single call. E.g.*, ROA.788 (defining "interpreter availability" without reference to callbacks or call disconnections).

Thus, CMS's adoption of the no-callbacks rule—evidenced in both its technological blocking of callback attempts (ROA.167–68) and its rejection of Humana's protest in the 2025 Star Ratings process (ROA.740 (statement that "CMS does not allow callbacks from the plan" and "all questions should be answered in a single call"))—substantively updated the Foreign Language Interpreter Measure. Under the rule, "[t]he measure is considered completed when contact has been established with an interpreter and the introductory question has been correctly answered within eight minutes of reaching a CSR" (ROA.264)—not full stop, but *in a single call only*.

This update "meaningfully impact[s] the numerator . . . of the measure" (42 C.F.R. § 422.164(d)(1)) by preventing MA plans from following "standard practice" according to which "a customer service representative [must] attempt to call back" when a "call is unexpectedly disconnected" (ROA.166). It also "change[s] the nature of the measure" (83 Fed. Reg. at 16534) by recalibrating it to test for mere call disconnections rather than the ability of an MA plan to connect a caller with an interpreter in under eight minutes, even despite a call disconnection. The no-callbacks rule is thus a substantive

alteration to the Foreign Language Interpreter Measure, and it had to proceed through notice-and-comment rulemaking under Section 422.164(d)(2).

**c.** The plain text of Section 1395hh(a)—which 42 C.F.R. § 422.164(d) implements—likewise confirms that notice-and-comment was required. Section 1395hh(a) requires notice-and-comment before CMS promulgates a "substantive legal standard" that governs "payment for services" or the eligibility of MAOs or beneficiaries "to furnish or receive services or benefits." *See generally Allina Health*, 587 U.S. at 572–83. Substantive changes to Star Ratings measures, including the no-callbacks rule, meet that description.

"A 'substantive legal standard' at a minimum includes a standard that 'creates, defines, and regulates the rights, duties and powers of parties.'" *Allina Health Services*, 863 F.3d at 943 (quoting Black's Law Dictionary (10th ed. 2014)). That describes the no-callbacks rule, which defines the duty of an MAO to comply with 42 C.F.R. § 422.111(h)(1)(iii) in a single call, and not using a callback, even when a callback is possible within the prescribed time period.

The no-callbacks rule also governs "payment for services" within the meaning of Section 1395hh(a)(2). CMS has openly acknowledged that "the quality Star Ratings system is a component of the payment methodology for MA and MA-PD plans." 83 Fed. Reg. at 16524. In particular, quality bonus payments "increas[e the] benchmark against which [an MA plan must] bid"

and the percentage of the "difference between their bid and benchmark" to which the plan is entitled. *Elevance*, 736 F. Supp. 3d at 6; *see* 42 U.S.C. §§ 1395w-23(o)(3)(A), 1395w-24(b)(1)(C)(v). Since the Star Ratings determine QBPs, and QBPs are "a component of the payment methodology for MA and MA-PD plans" (83 Fed. Reg. at 16524), it follows that the Star Ratings measures govern "payment for services" within the meaning of Section 1395hh(a)(2).

The no-callbacks rule furthermore governs the eligibility of MAOs to furnish services or benefits, and of beneficiaries to receive the enhanced benefits that higher QBPs require. Only MA plans with 5.0 Star ratings are eligible to enroll beneficiaries outside of open enrollment. 42 C.F.R. § 422.62-(b)(15). And pursuant to Section 422.502(b)(1)(i)(D), "CMS may deny an application" to participate in MA or Part D if an MAO "[r]eceived any combination of Part C or D summary ratings of 2.5 or less in both of the two most recent Star Rating periods." It also may "terminate" a pending contract if the plan achieves a "rating of less than 3 stars for 3 consecutive contract years." 42 C.F.R. § 422.510(a)(4)(xi). Thus, the Star Ratings directly and plainly govern "the eligibility of . . . organizations to furnish . . . services or benefits under" MA and Part D. 42 U.S.C. § 1395hh(a)(2).

CMS has confirmed all this by its past rulemaking conduct. The agency promulgated the call-center requirements through notice-and-comment rule-

making—*e.g.*, 42 C.F.R. §§ 422.111(h)(1)(iii), 423.128(d)(1)(iii)—reflecting its own understanding that such requirements are "substantive legal standards" covered by Section 1395hh(a). It thus expressly cited Section 1395hh as its statutory authority for promulgating regulations governing the requirements for the Star Ratings measures, including the foreign-language requirement. *See* 86 Fed. Reg. at 6094.

### *2. The district court's contrary rationales are incorrect*

The district court rejected these arguments. But its reasoning differed from the agency's and was independently flawed.

**a.** Take first the Section 422.164(d) issue, which featured prominently the parties' briefing below. CMS argued that Section 422.164(d)(1) applies to the no-callbacks rule, allowing the agency to promulgate the rule through the informal procedures specified in 42 U.S.C. § 1395w-23(b)(2). *See* ROA.1233, ROA.1237, ROA.1239, ROA.1305, ROA.1310.

Appellants disagreed, arguing that Section 422.164(d)(2), which "expressly requires the adoption of 'substantive' measure changes 'through [formal notice-and-comment] rulemaking,'" applies instead, given that "[t]he no-callbacks rule is a substantive amendment of the eight-minute rule." ROA.1274–75. Appellants thus contended that Section 422.164(d)(1) and its incorporation of the informal notice process under Section 1395w-23(b)(2) is

"not the appropriate vehicle for notifying the public and taking comment on the no-callbacks rule." ROA.134.

The district court's resolution of this issue was equal parts confus*ed* and confus*ing*. First, the court misconstrued appellants' principal argument as a contention that "CMS never announced or sought comments" on the no-callbacks rule "in the guidance used for updating Star Ratings methodologies." ROA.1326 (citing 42 U.S.C. § 1395w-23(b)(2)). In fact, appellants' principal argument was that Section 422.164(d)(1), and its incorporation of the informal notice process specified in 42 U.S.C. § 1395w-23(b)(2), does not apply to the no-callbacks rule at all. Because the rule is substantive, formal notice and comment is required under Section 422.164(d)(2), instead. As to *that* argument, the district court offered no analysis and gave no answer.

To be sure, appellants did argue as a fallback that, "[e]ven if [Section] 1395w-26(b)(2) specified the proper method for proposing and adopting the no-callbacks rule," it would make no difference because "CMS has never announced or sought comment on the no-callbacks rule even under that provision." ROA.134. But the district court misunderstood that contention, as well. It appeared to conclude that CMS satisfied its informal notice obligation under 42 U.S.C. § 1395w-23(b)(2) by simply making the no-callbacks rule "clear from" or "evident [in] the guidance." ROA.1326–1327. That holding is wrong in at least four distinct ways.

***First,*** appellants' theory is not that the no-callbacks rule is unlawful because it was unclear or applied surreptitiously. The district court was correct that "Humana . . . knew CMS required an interpreter to be placed on the line in a single call" (ROA.1326), which it had learned because CMS blocks callback attempts with a message informing the CSR that "your call cannot be completed at this time" (ROA.167). *See also* ROA.195 ("it is Humana's understanding that CMS would not accept a call back"). Rather, appellants' argument was that the rule had been adopted without the notice-and-comment procedures required by law. It is no answer to a claim that an agency has failed to follow a statutorily prescribed procedure (whether informal or formal) simply to observe that a challenged policy "is clear." *Contra* ROA.1326. Such claims center on the process of adoption, not the clarity of the rule.

***Second,*** the district court appeared to believe that CMS satisfies its informal notice obligation under Section 422.164(d)(1) by simply implementing a measure update in the Technical Notes. That is incorrect. Section 422.164(d)(1) calls for adoption of non-substantive measure changes using "the process described for changes in and adoption of payment and risk adjustment policies" under 42 U.S.C. § 1395w-23(b)(2). That process requires CMS to distribute an "Advanced Notice of Methodological Changes" each year, detailing non-substantive, administrative updates to its capitation-rate policies. *See, e.g.*, CMS, Advance Notice of Methodological Changes for Cal-

endar Year (CY) 2027 for Medicare Advantage (MA) Capitation Rates and Part C and Part D Payment Policies (Jan. 26, 2026), https://perma.cc/-2JNW-MDNR.

Our point, which is a matter of indisputable fact, is that CMS not only failed to promulgate the no-callbacks rule using notice and comment, but that it *also* failed to announce the no-callbacks rule in an Advanced Notice issued under Section 1395w-23(b)(2). So even if CMS were correct that Section 422.164(d)(1) applies here (it does not), it would do the agency no good.

***Third,*** the district court was wrong in any event to hold that the no-callbacks rule is "evident" or "clear" from the "plain meaning of the text of" of the Technical Notes. *See* ROA.1326–27.

The district court's reasoning on this point rested on two mistaken premises. It first found significant that the Technical Notes state how the agency will score "a call," using the singular and not the plural. ROA.1326. The court concluded that "[i]f the policy allowed callbacks, it would not use the singular form." *Id.* Yet, since the days of the Dictionary Act, it has been "a basic rule of statutory construction that the singular includes the plural." *Seth B. ex rel. Donald B. v. Orleans Parish School Board*, 810 F.3d 961, 975 n.52 (5th Cir. 2016); *see also* 1 U.S.C. § 1 ("words importing the singular" cover the plural); A. Scalia & B. Gardner, *Reading Law: The Interpretation of Legal Texts* 130 (2012) (same). So that reason doesn't hold up.

The district court observed, second, that "the language [of the Technical Notes] addresses the CMS test caller as 'caller,'" which the caller would cease to be "if Humana calls back" after a call drop. ROA.1327. In that case, the caller "becomes the callee and is no longer the caller." *Id.*

Respectfully, that is not how normal people use the English language. When a person calls a customer service line, and the call is unexpectedly disconnected, and the CSR returns the call to continue the conversation—a common experience given that it is industry standard practice—an ordinary person would continue to refer to the customer who initiated the original call as the "caller." The CSR would have simply reestablished the connection that *the caller* earlier had made. Certainly, nothing in that district court's unusual and contrary view makes it "clear" or "evident" that MA plans are barred from calling back after a disconnection.

***Fourth,*** and finally, none of this newfound reasoning was offered by CMS during the administrative review process. Indeed, it was not even offered by CMS in its briefing before the district court. Rather, the late-breaking theory that the no-callbacks rule has been baked into the Technical Notes from the start was a *sua sponte* invention of the district court itself.

That is fatal to this entire endeavor, for "'[a]n agency's action must be upheld, if at all, on the basis articulated by the agency itself,' not reasons developed post hoc." *Texas v. United States*, 40 F.4th 205, 226 (5th Cir. 2022)

(quoting *Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 50 (1983)). This Court therefore will not "evaluate *post-hoc* justifications" that the agency did not articulate at the time it made its decision. *Chamber of Commerce v. SEC*, 85 F.4th 760, 775 & n.17 (5th Cir. 2023). Here, that means that the district court's conclusion that the Technical Notes already state the no-callbacks rule is off the table and provides no basis for affirming.

**b.** The district court's rationale for rejecting appellants' reading of 42 U.S.C. § 1395hh(a)(2) fares no better. On this front, the district court held first that "quality bonus payments and rebates are not 'payments for services'" within the meaning of Section 1395hh(a)(2), which refers only to "the amounts Medicare must pay providers for furnishing covered services." ROA.1323. According to the court, "[r]egardless of how much money an MAO receives in quality bonus payments," the amount an MAO must pay for covered services remains unaffected. *Id.*

That is mistaken. In fact, plans must use QBPs to provide additional supplemental benefits to enrollees. 42 U.S.C. §§ 1395w-23(a)(1)(B)(i), (E), 1395w-24(b)(1)(C). Thus QBPs are "payments" from the government to MA plans "for services" to and for enrollees.

In defining the roles that MAOs play under the MA program, moreover, Congress specified that MAOs "must provide to members enrolled under this

section," "through providers," the "services covered under parts A and B." 42 U.S.C. § 1395mm(c)(2)(A); *see also id.* § 1395w-25(d)(2) (referring to "the need for [an MAO] to assume responsibility for providing . . . items and services under the contract . . . through . . . providers"). QBP payments are thus payments to MA plans for covered services.

The district court next held that the Star Ratings do not govern an MA plan's eligibility "to furnish or receive services or benefits" for enrollees changing plans mid-year. ROA.1324. That simply is not so. A plan with fewer than 5.0 Stars is denied "eligibility . . . to furnish . . . services or benefits" to mid-year enrollees, plain and simple. 42 C.F.R. § 422.62(b)(15); *see* 42 U.S.C. § 1395hh(a)(2). For that reason alone, the substantive standards underlying the Star Ratings must satisfy Section 1395hh(a)(2)'s rulemaking requirement—as 42 C.F.R. § 422.164(d)(2) expressly provides.

The district court disagreed again, holding that the Star Ratings only "influence," and do not "govern," eligibility for low-performing MA plans to participate in the MA program. ROA.1324. That, too, is mistaken.

A plan with insufficient Stars for the prior three years may be "terminated by CMS" for that reason. *Elevance*, 736 F. Supp. 3d at 6. Its application for renewal may be denied, also, for that reason. 42 C.F.R. § 422.510(a)(4)(xi). In the most straightforward way, the Star Ratings thus "control" (ROA.1324) whether an MA plan can be summarily expelled from the pro-

gram. It does not matter that CMS must exercise discretion to terminate a low-performing contract, as the district court thought. The point is that, for the exercise of such discretion even to be a possibility under the prevailing regulations, the plan's Star Ratings must fall below the minimum level. The Star Ratings thus control when a plan may be expelled.

It is presumably for these reasons that CMS itself has concluded that substantive changes to the Star Ratings measures must go through notice-and-comment. 42 C.F.R. § 422.164(d)(2). When CMS engages in such rulemaking, it cites Section 1395hh as its authority. Indeed, CMS recently cited Section 1395hh as authority in a notice of proposed rulemaking that, if finalized, will repeal the Foreign Language Interpreter Measure altogether. *See* 90 Fed. Reg. at 54966, 55010. The agency's decision to substantively update the Foreign Language Interpreter Measure with the no-callbacks rule therefore had to go through notice-and-comment pursuant to 42 C.F.R. § 422.164(d)(2) and 42 U.S.C. § 1395hh(a)(2).

### B. Because the Accuracy & Accessibility Study implements Section 422.111(h)(1)(iii), CMS may not substantively change the Study without first changing the regulation

If the Court agrees that the no-callbacks rule must be promulgated using notice-and-comment rulemaking according to the plain terms of Sections 422.164(d)(2) and 1395hh(a)(2), it need not say more on the topic. But if for any reason the Court harbors doubt, it may hold in addition (or the alternative)

that the no-callbacks rule requires notice-and-comment rulemaking because the Accuracy & Accessibility Study implements 42 C.F.R. § 422.111(h)(1)(iii). A substantive amendment of the Accuracy & Accessibility Study thus requires either a change through notice-and-comment rulemaking to Section 422.111-(h)(1)(iii) itself, like the addition of the eight-minute rule in 2021; or a substantive update to the Foreign Language Interpreter Measure, also through notice-and-comment rulemaking, decoupling it and the underlying Accuracy & Accessibility Study from 42 C.F.R. § 422.111(h)(1)'s requirements.

**1.** CMS guidance states clearly and repeatedly that the Accuracy & Accessibility Study, which is the agency's protocol for collecting data for the Foreign Language Interpreter Measure, implements the foreign-language interpreter regulation, Section 422.111(h)(1)(iii).

To start, the Technical Notes explain that the "Call Center Monitoring studies," including the Accuracy & Accessibility Study, have been adopted "for the purpose of monitoring the performance of plan sponsors' call centers with respect to the standards adopted to implement 42 C.F.R. § 422.111(h)(1) and 42 C.F.R. § 423.128(d)(1)." ROA.256. Thus, the Accuracy & Accessibility Study is undertaken "to determine if [a plan's] services were compliant with 42 C.F.R. §§ 422.111(h)(1)(iii) and 423.128(d)(1)(iii), which require interpreters to be available for 80 percent of incoming calls requiring an interpreter within 8 minutes." ROA.808.

Annual CMS program memoranda confirm the same. For instance, CMS explained in its "2024 Part C and Part D Call Center Monitoring" memo that the agency uses third-party contractors like Hendall "to monitor the performance of plan sponsors' call centers with respect to the standards at 42 C.F.R. § 422.111(h)(1) and 42 C.F.R. § 423.128(d)(1)." *See* ROA.746, ROA.768. CMS considers the test successfully "completed when the caller confirms that the CSR is able to answer questions about plan benefits via an interpreter . . . within eight minutes." *See* ROA.747, ROA.769.

If that sounds like the standard established by Section 422.111(h)(1), it's because it is. Indeed, in CMS's own "tips for success" in the Accuracy & Accessibility Study, the agency instructs MA plans to "[e]nsure that CSRs are trained on requirements of 42 C.F.R. § 422.111(h)(1)." ROA.754.

Because the Foreign Language Interpreter Measure and Accuracy & Accessibility Study together enforce Section 422.111(h)(1)(iii), it follows that the standards with which the Study tests an MA plans' compliance must actually reflect the standards enumerated in Section 422.111(h)(1)(iii). When CMS amends the Study so that it requires compliance with standards that are *not* reflected in Section 422.111(h)(1)(iii)—like the no-callbacks rule—the agency effectively amends the regulation without notice-and-comment rulemaking. Alternatively, it disconnects the Accuracy & Accessibility Study from the regulation, so that the Study no longer monitors compliance with Section

422.111(h)(1)(iii)—an outcome that "change[s] the nature" of the Foreign Language Interpreter Measure (83 Fed. Reg. at 16534) and thus likewise requires notice-and-comment. *See* 42 C.F.R. § 422.164(d)(2).

**2.** The district court rejected these arguments. In its view, the Foreign Language Interpreter Measure and Accuracy & Accessibility Study do not implement Section 422.111(h)(1)(iii), because an MA plan that complies with the standards established by Section 422.111(h)(1)(iii) still may "receiv[e] a Star Rating lower than 5.0." ROA.1325. This is evidence, in the district court's view, that the Foreign Language Interpreter Measure and Accuracy & Accessibility Study do not enforce the requirements of Section 422.111(h)(1)(iii), but instead only "compare a contract's performance . . . against its peers" with respect to the general subject matter of that regulation. ROA.1325.

The clearest problem with that holding is its square conflict with several authoritative statements of CMS itself. The agency has confirmed in the plainest terms that "many [Star Ratings] measures *are based on compliance with Medicare rules and requirements* (for example, call center measures and appeals measures) and reflect compliance with Medicare program requirements, *not comparative compliance*" across plans. 85 Fed. Reg. 33796, 33834 (June 2, 2020) (emphasis added). Consistent with that explanation, CMS has stated explicitly that the purpose the Accuracy & Accessibility Study is "to determine if [plans are] compliant with 42 C.F.R. § 422.111(h)(1)(iii)." ROA.808.

The fact that a plan can meet the minimum requirements set by Section 422.111(h)(1)(iii) and nonetheless earn "a Star Rating lower than 5.0" (ROA.1325) does not suggest otherwise. A regulatory program that penalizes regulatory noncompliance (by, for example, making plans eligible for program termination) while rewarding performance above the regulatory minimum (by, for example, extending more generous QBPs) still enforces the regulation. That is the case here: A plan that complies with the regulatory standards but no more may continue participating in the program—even if it will not receive bonus payments for particularly excellent performance.

Against this background, any substantive changes to the Accuracy & Accessibility Study taking it out of step with Section 422.111(h)(1)(iii) had to go through notice and comment.

### C. CMS did not comply with its notice-and-comment duties

We have shown in two related ways that adoption of the no-callbacks rule was supposed to proceed through notice-and-comment rulemaking. By either path, 42 U.S.C. § 1395hh(b)(1) required CMS to "provide for notice of the proposed regulation in the Federal Register and a period of not less than 60 days for public comment thereon."

CMS did not adopt the no-callbacks rule using the notice-and-comment procedures specified in Section1395hh(b). "Because affected members of the public received . . . no chance to comment" before CMS implemented the no-

callbacks rule, "and because the government has not identified a lawful excuse for neglecting its statutory notice-and-comment obligations," the no-callbacks rule "cannot stand." *Allina Health*, 587 U.S. at 568. Neither can Humana's 2025 Star Ratings, which were adversely affected by CMS' refusal to permit callbacks under the unlawfully adopted rule. ROA.166–68; *accord* ROA.1033, ROA.1042, ROA.1075.

## II. THE NO-CALLBACKS RULE IS SUBSTANTIVELY ARBITRARY

Entirely apart from CMS's adoption of the no-callbacks rule without notice and comment, the rule is unlawful because it is substantively arbitrary and capricious. It bears no rational connection to the objectives of the Foreign Language Interpreter Measure or the Accuracy & Accessibility Study, nor to the purposes of 42 C.F.R. § 422.111(h)(1)(iii). It requires counting bare call disconnections against MA plans, even when such disconnections would not prevent a plan from complying with the regulatory standard using the industry standard practice of calling back. *See Mexican Gulf Fishing v. U.S. Department of Commerce*, 60 F.4th 956, 971–73 (5th Cir. 2023) (an agency rule must be "based on a consideration of the relevant factors" and "bear a rational relationship" to the issues it is designed to address).

The no-callbacks rule thus penalizes plans under the Foreign Language Interpreter Measure for a shortcoming that the measure is not designed to evaluate. Moreover, bare call disconnections are evaluated (by design) by a

separate call center study; by counting them under the Foreign Language Interpreter Measure as well, CMS is double-weighting a call center's propensity for call disconnections as a general matter.

**A.1.** Under the arbitrary-and-capricious standard of review, the Court must assure itself that (1) "the agency considered the relevant factors in making [its] decision," (2) "its action bears a rational relationship to the . . . purposes" of the underlying policies or instruments that the action implements, and (3) "there is substantial evidence in the record to support it." *Public Citizen v. EPA*, 343 F.3d 449, 455 (5th Cir. 2003).

Here, the extent of the Court's review is constrained by the fact that the agency did not take and respond to comments following a notice to the public of its plan to adopt the no-callbacks rule. The agency's reasoning and rationale is thus almost entirely opaque. But one point is clear at least: The no-callbacks rule does not "bear a rational relationship" to the purposes of the Foreign Language Interpreter Measure and Accuracy & Accessibility Study. Again, the measure and its underlying study are "performed to ascertain" (83 Fed. Reg. at 16551) whether a plan's "CSR is able to answer questions about plan benefits via an interpreter . . . within eight minutes" (ROA.747, ROA.769).

The no-callbacks rule does not advance that objective. The occasion of a call disconnection does not, by itself, mean that a plan cannot make an interpreter available to the caller within the eight-minute clock set by the regula-

tion. As a matter of both logic and experience, a CSR *could* "answer questions about plan benefits via an interpreter . . . within eight minutes" (ROA.747, ROA.769) even following an initial call disconnection, by simply using a call-back. By automatically and categorically penalizing MA plans for call disconnections under the Foreign Language Interpreter Measure, the policy produces results that do not reflect the plan's performance with respect to the standard that the measure is actually intended to assess: the availability of interpreters in eight minutes or less at the plan's call center.

**2.** In response, CMS argued below that "[t]he no-callback policy is rationally connected to the goals of the Star Ratings" call center measures, which are generally "meant to measure the quality of a Plan's ability to provide help to beneficiaries who need it." ROA.1240–41. Because anyone "would likely agree that a call center that does not drop calls and provides answers on a single call provides better customer service," the no-callbacks rule rationally accounts for "a plan's ability to provide a service that is important to Medicare beneficiaries." ROA.1241. The district court agreed, holding without elaboration that "CMS has articulated a rational connection to satisfy arbitrary and capricious review." ROA.1327.

But that misses the point, which is that the Foreign Language Interpreter Measure and Accuracy & Accessibility Study are designed to measure, not the quality of call-center performance *generally*, but a very specific feature

of each plan's call-center performance: "the availability of interpreters for individuals" who speak a foreign language. ROA.1129. It evaluates, more specifically, whether a plan's "CSR is able to answer questions about plan benefits via an interpreter . . . within eight minutes." (ROA.747, ROA.769).

Because the no-callbacks rule is implemented under the Accuracy & Accessibility Study and drives a plan's results under the Foreign Language Interpreter Measure, the rule must bear a rational connection to the objectives of that particular measure and study. It does not.

**B.** By testing for bare call disconnections—a feature the Foreign Language Interpreter Measure and Accuracy & Accessibility Study are not designed to evaluate—the no-callbacks rule arbitrarily double-weights the effect of its call center's tendency to drop calls.

Of course, a customer service call that is resolved in a single call without a disconnection is preferable to a disconnection followed by a callback. But CMS has designed the Timeliness Study to evaluate call disconnections and compliance with 42 C.F.R. § 422.111(h)(1)(ii)(C), which requires plans to "limit[] the disconnect rate of all incoming [customer service] calls to 5 percent." It reports the results under a distinct measure titled "Calls Disconnected When Customer Calls Health Plan." ROA.581, ROA.586.

The Timeliness Study, unlike the Accuracy & Accessibility Study, is meant to measure "average hold time and disconnect rates" (ROA.801) and

thus factors call disconnections into each plan's Calls Disconnected Measure score. To enforce the no-callbacks rule through the Accuracy & Accessibility Study, so that the Foreign Language Interpreter Measure also penalizes MA plans for call disconnections (which is not its purpose), is to count disconnections as a demerit using two measures—one intended to measure call disconnections and another not. That is arbitrary and capricious.

Saying so does not mean that CMS must "ignore dropped calls" in the Accuracy & Accessibility Study, as the agency contended below. If a call center drops a call and fails to call back, or if it takes too long calling back, the call will be scored unsuccessful based on the metric that the Accuracy & Accessibility Study is actually meant to measure: connection with an interpreter in eight minutes or less. But a disconnected call should not be scored unsuccessful when the call center, using industry standard practice, can reconnect and bring an interpreter on the line within the regulatory time limit.

For both of these reasons, the no-callbacks rule is arbitrary and capricious: It is not rationally connected to the purposes of the Foreign Language Interpreter Measure and Accuracy & Accessibility Study, and it overweighs the impact of bare call disconnections, which are separately measured by the Timeliness Study and reflected in each plan's "Calls Disconnected" score. On these bases, too, the Court should set aside the no-callbacks rule and the 2025 Star Ratings that were adversely impacted by it.

## III. THE SILENT CALL SHOULD HAVE BEEN INVALIDATED

CMS refused to invalidate call C0701002, in which the secret shopper remained silent throughout the entire call. In doing so, CMS contradicted its own guidance on how it evaluates test calls and failed to adequately consider Humana's meaningful objections. The call should have been invalidated. A secret shopper must actually speak in a foreign language before a plan can be penalized for failing to make an interpreter available within eight minutes. That follows from regulations, guidance, and common sense alike.

**A.** During call C0701002, the secret shopper remained silent for several minutes without saying a word after joining the line. ROA.175. The caller's notes suggest that she mistakenly believed she was on a "silent" hold and therefore did not speak. ROA.181. After an extended period of silence with no communication—more than six minutes—the call was disconnected. *Id.*, ROA.1044.

The regulation shows that the call should have been invalidated rather than scored as unsuccessful. The regulation requires that "interpreters must be available" when needed "within 8 minutes of *reaching* the customer service representative." 42 C.F.R. § 422.111(h)(1)(iii)(B) (emphasis added). Accordingly, a call center's obligation to provide an interpreter within eight minutes is triggered only if a caller "reaches" a CSR.

In the context of a telephone call, the word “reach” means *communicate with*. *See New Oxford American Dictionary* 1415 (2001) (defining “reach” as to “communicate with (someone) by telephone or other means”); *Webster’s Third New International Dictionary* 1888 (1993) (defining “reach” as to “communicate with . . . by phone”). When a secret shopper dials the line but remains perfectly silent after the CSR picks up, he has not “reached” the plan’s representative within the meaning of the regulation.

The administrative record bears this out: CMS’s contractor confirmed that the caller, because she remained silent, did not “make contact with a CSR.” ROA.183. That resolves the issue, because a caller who does not say anything—who never makes contact with and reaches the CRS—never triggers a plan’s obligation to make an interpreter available.

CMS guidance supports the same conclusion. The Accuracy & Accessibility Study proceeds in three relevant phases for foreign language calls: dial, connect, and introductory question. ROA.258–59. At the connect phase, the caller “determine[s] if [they] can reach a live CSR at the plan who can assist [them] with [their] questions.” ROA.258. According to CMS guidance, “[a] call is considered connected *when the caller confirms that the call connects to the CSR*.” ROA.264. (emphasis added).

Consistent with that position, CMS has explained that if a secret shopper “establish[es] contact with your CSR *while speaking in a foreign language*,

the call is connected." ROA.271 (emphasis added). Only after that point will the caller "ask an introductory question." *Id.* The confirmation of a connection with the CSR is thus a prerequisite to the third phase (initial question), which is what triggers the duty to bring an interpreter into the call within eight minutes (ROA.259)—a prerequisite not met here.

Our position is confirmed by common sense, too. The point of secret shopper calls is to test a call center's ability to make interpreters available for non-English speakers within the regulatory timeframe. It is irrational for CMS to hold an MA plan responsible for not making an interpreter available to a caller who joins a call and stays silent, without saying anything in a foreign language. A secret shopper who calls the line and sits in silence has not tested what they are supposed to be testing: the call center's ability to assist non-English speakers with interpreters. That is why CMS regulations and guidance require that the caller actually *speak* in a foreign language before a CSR has an obligation to respond by bringing an interpreter into the call.

**B.** That was the holding of the District Court for the Eastern District of Texas in *UnitedHealthcare Benefits of Texas v. CMS*, 2024 WL 4870771 (E.D. Tex. 2024). There, the court explained that if a test caller remains silent and "never ask[s] the introductory question" after a CSR joins the line, the caller "act[s] contrary to [CMS's] guidelines." *Id.* at *4. In such a case, when the

CMS test caller remains silent, "the call should not [be] marked as 'unsuccessful'" and should be invalidated. *Id.*

The district court reasoned that the *UnitedHealthcare* decision is distinguished because there was evidence in that case that the caller had in fact been connected with a CSR, whereas here "there is no proof that Humana connected the caller to a live customer service representative." ROA.1329. Thus, whereas the *UnitedHealthcare* call progressed to a point where the caller bore the burden to speak, the district court concluded that the call in this case "was rated as unsuccessful" before that point. *Id.*

That cannot sustain CMS's scoring of the call as unsuccessful. To begin with, there *is* evidence that the Humana CSR joined the line before the disconnection—namely, the written statements of senior Humana officials submitted to the agency. Although the statements are not formal declarations under 28 U.S.C. § 1746, the agency may consider "evidence that would be inadmissible under rules applicable to court procedures." 42 C.F.R. § 422.678. The written statements at issue here were signed by senior officials on behalf of the company, and their veracity has never been challenged.

More fundamentally, this was not the reason that the agency gave for rejecting Humana's protest, and it thus may not be considered. *See Texas*, 40 F.4th at 226–27. Humana submitted a statement asserting that "there was no dialogue between the CMS caller and CSR" *because* "[t]he CMS caller re-

mained silent throughout the duration." ROA.175, ROA.187. "As a result," the company official explained, "the Humana CSR was unable to identify the needs of the caller." *Id.* She indicated the "the CMS caller" made a "mistake" in thinking caller was on hold. *Id.*

In response, the agency did not say that it required extrinsic evidence to confirm Humana's statement. (If it had done so, Humana would have readily produced it.) The agency defended the call's score only on the ground that "the disconnect" was "initiated" by the CSR, and "it is not unusual for the interviewer to remain silent while waiting for a CSR as they would not understand anything being presented in English." ROA.186. That is all.

The hearing officer took a different tack in the informal reconsideration process. She noted that "both [the] CSR and the CMS caller were silent for the duration of the call." ROA.1158. This, she believed, distinguished *UnitedHealthcare* because, in that case, the test caller "heard the CSR speak." ROA.1159. But that misreads the case. "CMS contend[ed]" in *UnitedHealthcare* "that the test caller . . . did not ask the introductory question because he believed he was on hold" (2024 WL 4870771, at *5)—precisely as it does here (ROA.186–87). Moreover, "[n]o dialogue occur[red] between the test caller and the CSR" in *UnitedHealthcare*, and when the test caller asked "Hello?", the CSR remained silent. 2024 WL 4870771, at *2.

Against this background, the reasoning of *UnitedHealthcare* applies with full force: In that case, just like this one, "CMS's justification [for scoring the call unsuccessful] effectively shifts the burden to the CSR to engage with the test caller before the introductory question is asked." *Id.* at *4. But the "guidelines [do not] impose such a burden." *Id.* "Rather, the guidelines contemplate only that the caller will ask the introductory question and then measure whether the CSR answers it appropriately" through an interpreter timely joined to the line. *Id.* If a test caller remains silent, the caller fails to test the measure according to the guidelines. CMS cannot score a call unsuccessful by "requiring a call center to engage with the test caller before hearing an introductory question." *Id.*

This district court's contrary reasoning below—its assertion that "there is no proof that Humana connected the caller to a live customer service representative" (ROA.1329)—both is wrong and was not adopted by the agency in the informal review process or by the hearing officer in the reconsideration process. It therefore is no basis for affirming. *Texas*, 40 F.4th at 226–27.

## CONCLUSION

The court should reverse and remand with instructions to: (1) declare that the no-callbacks policy is unlawful, (2) set aside Humana's 2025 Star Ratings for all contracts adversely impacted by calls D09000533, D1100955, and C0701002, and (3) remand the matter to CMS for recalculation of Humana's 2025 Star Ratings and quality bonus payments.

February 13, 2026

Respectfully submitted,

/s/ *Michael B. Kimberly*

MICHAEL B. KIMBERLY
*Winston & Strawn LLP*
*1901 L Street NW*
*Washington, DC 20036*
*(202) 282-5096*

EDWARD A. DAY
*Winston & Strawn LLP*
*300 N. LaSalle Drive*
*Chicago, IL 60654*
*(312) 558-8106*

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32 and Fifth Circuit Rule 32, undersigned counsel certifies that this brief:

(i) complies with the type-volume limitation of Rule 32(a)(7)(B) because it contains 12,659 words, including footnotes and excluding the parts of the brief exempted by Rule 32(f); and

(ii) complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it is typeset in Century Supra font in 14 points.

Dated: February 13, 2026 /s/ *Michael B. Kimberly*