# 25-11302

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

**Humana, Incorporated; Americans for Beneficiary Choice**,
Plaintiffs-Appellants

v.

**United States Department of Health and Human Services; Centers for Medicare & Medicaid Services; Robert F. Kennedy, Jr., in his official capacity as Secretary of Health and Human Services; Mehmet Cengiz Oz, in his official capacity as Administrator of the Centers for Medicare & Medicaid Services**,
Defendants-Appellees

---

On Appeal from the United States District Court
for the Northern District of Texas, Dallas Division
District Court No. 4:25-CV-779-O

---

## BRIEF FOR APPELLEES

---

Ryan Raybould
United States Attorney

Brian W. Stoltz
Assistant United States Attorney
Texas State Bar No. 24060668
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone:    214-659-8626
Facsimile:    214-659-8807
brian.stoltz@usdoj.gov

Attorneys for Appellees

## STATEMENT REGARDING ORAL ARGUMENT

This is an Administrative Procedure Act case involving a challenge to the congressionally-mandated rating of a Medicare Advantage insurer's customer service functions. The case was decided in the district court on cross-motions for summary judgment, under a deferential standard of review and based on a straightforward administrative record relating to three test phone calls placed to the insurer's call center. It is therefore respectfully submitted that this appeal can be decided on the papers without the need for oral argument.

**TABLE OF CONTENTS**

Statement Regarding Oral Argument .................................................. i

Table of Authorities .................................................................... iv

Introduction .............................................................................. 1

Statement of Jurisdiction ............................................................... 3

Statement of the Issues ................................................................. 3

Statement of the Case .................................................................. 5

   1. Statutory and Regulatory Background .............................................. 5

      A. Medicare Advantage allows beneficiaries to receive
         benefits through private insurance plans. ..................................... 5

      B. Congress mandates that Medicare Advantage plan quality
         be assessed through a Star Ratings system................................... 7

      C. One aspect of the Star Ratings system is a measurement of
         the insurer's ability to provide foreign-language interpreters
         to beneficiaries who are calling to obtain information. ................ 10

      D. An administrative appeals process exists to resolve
         disputes about Star Ratings. ................................................ 12

   2. Factual Background ................................................................. 13

      A. Humana fails four test calls during a Star Ratings
         measurement of its call center's foreign interpreter
         availability. ..................................................................... 13

      B. Humana seeks to invalidate the results of the four failed
         calls during the preview period. ........................................... 14

      C. Humana files a premature suit to challenge the scoring of the
         calls without first exhausting administrative remedies. ................ 15

D. Humana administratively appeals the agency's scoring of three of the failed calls. ........................................................... 16

E. In the current lawsuit filed after Humana exhausted its administrative remedies, the district court rejects Humana's claims and upholds the agency's scoring of the failed calls. ......... 16

Standard of Review ...................................................................................... 18

Summary of the Argument ........................................................................... 18

Argument and Authorities .......................................................................... 20

1. The administrative record supports the agency's determination that the two disconnected calls were unsuccessful. ............................ 20

2. Even if the Court does consider the substance of the no-callback policy, the district court correctly held that the policy is lawful .......... 24

A. The agency was not required to use notice-and-comment rulemaking to establish the no-callback policy ........................... 24

B. The no-callback policy is not arbitrary. ...................................... 49

3. CMS correctly determined that the third, silent-hold call was unsuccessful. ....................................................................................... 53

Conclusion ..................................................................................................... 56

Certificate of Service ................................................................................... 58

Certificate of Compliance ............................................................................ 58

## TABLE OF AUTHORITIES

**CASES**

*Abbvie, Inc. v. Murrill*,
    166 F.4th 528 (5th Cir. 2026).................................................................. 18

*Bank of La. v. FDIC*,
    33 F.4th 836 (5th Cir. 2022)................................................................... 15

*Cohen v. de la Cruz*,
    523 U.S. 213 (1998)............................................................................... 28

*Craig v. Bisignano*,
    157 F.4th 773 (5th Cir. 2025).................................................................. 39

*In re Deepwater Horizon*,
    934 F.3d 434 (5th Cir. 2019)................................................................... 15

*Knapp v. U.S. Dep't of Agric.*,
    796 F.3d 445 (5th Cir. 2015)................................................................... 18

*Matter of Speedcast Int'l Ltd.*,
    76 F.4th 372 (5th Cir. 2023)..............................................................28, 29

*Mexican Gulf Fishing Co. v. U.S. Dep't of Commerce*,
    60 F.4th 956 (5th Cir. 2023)................................................................... 49

*OnPath Fed. Credit Union v. U.S. Dep't of Treasury, Cmty. Dev. Fin. Insts. Fund*,
    73 F.4th 291 (5th Cir. 2023)................................................................... 18

*Rollins v. Home Depot USA*,
    8 F.4th 393 (5th Cir. 2021) .................................................................... 33

*Sierra Club v. U.S. Dep't of Interior*,
    990 F.3d 909 (5th Cir. 2021)................................................................... 18

*UnitedHealthcare Benefits of Texas v. CMS*,
    No. 6:24-cv-357-JDK, 2024 WL 4870771
    (E.D. Tex. Nov. 22, 2024).................................................................55, 56

*Yogi Metals Grp. v. Garland*,
    38 F.4th 455 (5th Cir. 2022)................................................................... 23

*Yogi Metals Grp. v. Garland,*
    567 F. Supp. 3d 793 (S.D. Tex. 2021) ................................................. 23

**STATUTES, RULES, OTHER**

5 U.S.C. § 706(2)(A) ................................................................................ 18

5 U.S.C. § 706(2)(E) ................................................................................ 18

28 U.S.C. § 1291 ........................................................................................ 1

42 C.F.R. § 422.62(a)(1) ......................................................................... 29

42 C.F.R. § 422.62(a)(3)(i) ...................................................................... 29

42 C.F.R. § 422.62(b) .............................................................................. 29

42 C.F.R. § 422.162(b) .............................................................................. 8

42 C.F.R. § 422.164(c) .............................................................................. 9

42 C.F.R. § 422.164(d) .............................................................................. 9

42 C.F.R. § 422.164(d)(1) ....................................................................... 49

42 C.F.R. § 422.164(d)(1)(iv) ................................................................. 49

42 C.F.R. § 422.166 .................................................................................. 8

42 C.F.R. § 422.166(h)(2) ....................................................................... 12

42 C.F.R. § 422.254 .................................................................................. 6

42 C.F.R. § 422.258 .................................................................................. 6

42 C.F.R. § 422.260 .................................................................................. 9

42 C.F.R. § 422.260(a) ............................................................................ 13

42 C.F.R. § 422.260(c)(2)(v) .............................................................. 13, 54

42 C.F.R. § 422.266(a)(2)(ii) .................................................................... 9

42 C.F.R. § 422.266(b) ............................................................................ 27

42 C.F.R. § 422.266(b)(1) ............................................................... 27

42 C.F.R. § 423.186 ......................................................................... 8

42 C.F.R. § 466.162(a) ............................................................. 46, 52

42 U.S.C. § 405(g) ........................................................................... 3

42 U.S.C. § 405(h) ........................................................................... 3

42 U.S.C. § 1395d .......................................................................... 26

42 U.S.C. § 1395hh(a)(2) .......................................... 25, 27, 30, 32

42 U.S.C. § 1395ii ........................................................................... 1

42 U.S.C. § 1395k .......................................................................... 26

42 U.S.C. § 1395w-21(b) ................................................................. 6

42 U.S.C. § 1395w-22(a)(1)(A) ...................................................... 27

42 U.S.C. § 1395w-22(a)(1)(B) ...................................................... 27

42 U.S.C. § 1395w-23(a)(1)(A) ........................................................ 6

42 U.S.C. § 1395w-23(a)(1)(B)(ii) ................................................... 7

42 U.S.C. § 1395w-23(a)(1)(C) ........................................................ 6

42 U.S.C. § 1395w-23(b) ............................................................... 31

42 U.S.C. § 1395w-23(b)(2) ...................................................... 9, 31

42 U.S.C. § 1395w-23(n) ................................................................. 6

42 U.S.C. § 1395w-23(o)(1) ............................................................ 9

42 U.S.C. § 1395w-23(o)(3)(A)(i) .................................................... 9

42 U.S.C. § 1395w-23(o)(4)(A) ........................................................ 7

42 U.S.C. § 1395w-24(b)(1)(C) .................................................... 7, 9

42 U.S.C. § 1395w-24(b)(1)(C)(v) ................................................... 9

42 U.S.C. § 1395w-24(b)(2)(A) ............................................................... 7

42 U.S.C. § 1395w-101 ........................................................................... 6

42 U.S.C. § 1395x(b) ............................................................................ 26

42 U.S.C. § 1395x(h) ............................................................................ 26

42 U.S.C. § 1395x(m) ........................................................................... 26

42 U.S.C. § 1395x(q) ............................................................................ 26

A. Scalia & B. Garner,
    *Reading Law: The Interpretation of Legal Texts* (2012) .............................. 32

Black's Law Dictionary (12th ed. 2024) .................................................... 25

83 Fed. Reg. 16440 (Apr. 16, 2018) ............................................... 8, 37, 38, 47

85 Fed. Reg. 33796 (June 2, 2020) ............................................................ 47

86 Fed. Reg. 5864 (Jan. 19, 2021) ......................................................... 44, 45

## **INTRODUCTION**

This case arises from three instances where Humana, Inc.'s call center hung up on a caller seeking information.  Medicare Advantage Organizations (MAOs)—the private insurers that operate government-subsidized insurance plans that cover Medicare beneficiaries—must operate a toll-free number that provides information to Medicare beneficiaries, including foreign-language speakers.  Each year, the Centers for Medicare & Medicaid Services (CMS) notifies MAOs like Humana that it will use test callers to check the experience of Medicare beneficiaries who call its plans.  The MAOs know in advance when the study will run, what languages will be tested, and what criteria the MAOs must satisfy to have test calls marked "successful."  The results of these test calls are then part of the data CMS uses to calculate the "Star Ratings" for each Medicare Advantage contract on a congressionally-mandated scale of one to five stars.  Congress also requires CMS to base certain financial incentives on a plan's Star Ratings.  Every MAO knows well in advance that its call-center performance will affect its Star Ratings and knows the financial incentives associated with those ratings.

The three test calls that Humana challenges were unsuccessful by any measure.  In two of them, callers were placed on hold to await an interpreter and had the line abruptly disconnect through no fault of the callers.  In the

1

third, a caller heard *nothing* after the automated answering system completed its menu of options. That caller continued to hear nothing until once again the line—through no fault of the caller—went dead. Although Humana does not dispute these facts, it asked the district court to order CMS to invalidate the calls by removing them from the data set as if they had never happened.

The district court rightly declined to relieve Humana of responsibility for its call center's shortcomings. It held that the agency's determination that each call was, in fact, unsuccessful was not arbitrary and capricious. It also rejected Humana's challenges to CMS's commonsense policy requiring MAOs to provide an interpreter on incoming test calls rather than on a later callback, as relevant to the first two disconnected calls.

This Court should affirm. It does not need to address Humana's challenge to the no-callback policy because the administrative record makes it abundantly clear that Humana did not satisfy the requirements for a successful call. Humana's effort to challenge the no-callback policy also rests on an extra-record declaration that should not be considered in an APA record-review case. And even if this Court does reach the merits of the underlying policy, it should uphold the district court's well-reasoned decision, as well as its determination that the agency appropriately scored the test calls at issue.

## STATEMENT OF JURISDICTION

Humana and a trade association filed suit to challenge CMS's determination of certain 2025 Star Ratings for Humana's Medicare Advantage plans.[1]  (ROA.10.)  The district court had jurisdiction under 42 U.S.C. §§ 405(g)–(h) and 1395ii and entered judgment in favor of the agency on October 14, 2025.  (ROA.8, 1331.)  Humana timely filed a notice of appeal on November 25, 2025 (ROA.8, 1332), such that this Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

Challenging an agency determination made after an informal hearing on the record, Humana seeks to have three test calls that CMS marked "unsuccessful" reclassified as "invalid," meaning they would be removed from the data altogether and would not count against Humana for purposes of the Medicare Advantage Star Ratings.  On two of the calls, Humana hung up on test callers without ever putting an interpreter on the line—but Humana argues that the outcomes of these calls would have been different had it been permitted to attempt a callback later.  On the third call, Humana never put a

---

[1] In addition to CMS, the other defendants-appellees are the U.S. Department of Health and Human Services (HHS) (of which CMS is a component), the HHS Secretary, and the CMS Administrator.  This brief will simply refer to CMS or the "agency" unless some particular distinction is necessary.  And likewise, this brief will simply refer to "Humana" to be inclusive of both plaintiffs-appellants as context warrants.

live person on the line and disconnected the call after approximately six minutes.  The questions presented are:

1.    With respect to the two disconnected calls, is there any basis for overturning the agency's determination that these calls was correctly scored as unsuccessful when the record shows that Humana hung up on the test callers before an interpreter joined the line?  (And relatedly, given that Humana provided no evidence in the administrative proceedings that it contemporaneously identified the test calls as such and declined to call back on that basis, can the Court pretermit Humana's substantive challenge to the no-callback policy (issue 2) because that policy made no difference to the administrative decision?)

2.    (If not pretermitted by resolution of issue 1)  Did the district court correctly conclude that the no-callback policy is consistent with the Medicare statute, not arbitrary and capricious, and otherwise lawful?

3.    With respect to the third, "silent" call, did the district court correctly uphold the agency's assessment of that call as unsuccessful in light of the record evidence that Humana never put a live person on the line and disconnected the call after about six minutes?

## STATEMENT OF THE CASE

### 1.    Statutory and Regulatory Background

#### A.    Medicare Advantage allows beneficiaries to receive benefits through private insurance plans.

Medicare is a federally funded and administered health insurance program for eligible elderly and disabled persons and certain individuals with end-stage renal disease.  Medicare is administered through CMS, an agency within the U.S. Department of Health and Human Services.

The Medicare program is divided into four major components.  Parts A and B (sometimes known as "traditional" Medicare) generally provide insurance coverage for things like hospital stays and physician services, directly paid for by the government.  Under Part C, also known as Medicare Advantage, Medicare beneficiaries can elect to receive their Medicare benefits through a private insurance plan.  And Part D is a similar voluntary program that allows participating beneficiaries to receive prescription drug coverage through a private plan.

This case concerns Parts C and D, which are two programs under which the government pays insurance companies to provide coverage to participating Medicare beneficiaries.  Under Part C, private insurers provide coverage that beneficiaries would otherwise receive through traditional Medicare.  These insurers, known as MAOs (Medicare Advantage Organizations), contract with

the government to provide coverage in a particular geographic area.

Beneficiaries can then choose among the plans available where they reside. *See*

42 U.S.C. § 1395w-21(b).  The government pays MAOs a predetermined sum

for providing coverage to each beneficiary, based in part on the demographic

and health characteristics of that beneficiary.  *Id.* § 1395w-23(a)(1)(A), (C).

Under Part D, the government contracts with insurance companies that

provide subsidized prescription drug coverage to beneficiaries.  *See id.* § 1395w-

101.  Many insurers operate plans under Parts C and D, and the differences

between the programs are not material to this litigation.[2]  This brief will

therefore refer generically to insurers that provide Medicare coverage under

Parts C and D as MAOs.

To calculate payments to MAOs, CMS first determines a "benchmark,"

based on the per capita cost of covering Medicare beneficiaries under Parts A

and B in the relevant geographic area.  *Id.* § 1395w-23(n); 42 C.F.R. § 422.258.

Each MAO then submits a "bid," telling CMS what payment the MAO will

accept to cover a beneficiary with an average risk profile in that area.  42

C.F.R. § 422.254.  If the insurer's bid is less than the benchmark, the bid

---

[2] In many situations, regulations for Part C and Part D are substantively identical.  *See, e.g*, 42 C.F.R. §§ 422.164, 423.184.  In those circumstances, this brief generally cites the Part C regulations.

becomes the insurer's "base payment"—the amount it is paid for covering a beneficiary of average risk—and the insurer also receives a portion of the amount by which its bid is lower than the benchmark as a "rebate" that the MAO can use to fund supplemental benefits for beneficiaries or reduce plan premiums.  42 U.S.C. § 1395w-24(b)(1)(C); 42 C.F.R. § 422.260.  If the MAO's bid is greater than the benchmark, then the benchmark becomes the insurer's base payment, and the insurer must charge beneficiaries a premium to make up the difference.  *See* 42 U.S.C. §§ 1395w-23(a)(1)(B)(ii), 1395w-24(b)(2)(A).

**B.    Congress mandates that Medicare Advantage plan quality be assessed through a Star Ratings system.**

Congress has instructed that "[t]he quality rating for a [Medicare Advantage] plan shall be determined according to a 5-star rating system (based on the data collected under section 1395w-22(e) of this title)."  42 U.S.C. § 1395w-23(o)(4)(A).  CMS uses a Star Ratings system that rates each plan on a scale from 1 to 5 "stars" based on multiple quality measures (30 or 42 for the 2025 Star Ratings), depending on whether the plan is Medicare Advantage-only or also includes Part D coverage.  (ROA.829.)  These quality measures assess different aspects of health outcomes, patient experience, and care quality.  (ROA.825.)  To calculate these ratings measures, CMS uses a variety

of different data sources, including administrative and medical record review data, survey data, and performance measures. *See* 83 Fed. Reg. 16440, 16520, 16525 (Apr. 16, 2018). CMS determines each plan's overall rating by calculating a weighted average of the plan's Star Ratings on each of the different individual measures. (ROA.835–37.) The Star Ratings system is intended to assist beneficiaries in finding the best Medicare Advantage and Part D plans for their needs by providing information "that is a true reflection of the plan's quality and encompasses multiple dimensions of high quality care." 83 Fed. Reg. at 16520.

CMS began releasing Star Ratings for Medicare Advantage contracts in 2008. 83 Fed. Reg. at 16520. CMS publishes the Star Ratings each October for the upcoming year at the contract level, with each plan offered under that contract assigned the contract's rating. *See* 42 C.F.R. §§ 422.162(b), 422.166, 423.182(b), and 423.186. This case concerns the 2025 Star Ratings issued in October 2024.

Star Ratings do more than provide valuable information to beneficiaries when selecting a plan. Congress has provided that a plan contract's overall Star Rating should also affect payments to the MAO in two ways. First, plans that earn an overall rating of 4 stars or higher qualify for Medicare Advantage "quality bonus payments" in the form of an increased benchmark for the

contract year following the ratings year (*e.g.*, the 2025 Star Ratings can increase the Medicare Advantage bidding benchmarks for contract year 2026). *See* 42 U.S.C. § 1395w-23(o)(1), (o)(3)(A)(i). This increased benchmark in turn can allow a Medicare Advantage plan to increase its bid, receive higher rebates, or set lower premiums. *See id.* § 1395w-24(b)(1)(C); 42 C.F.R. § 422.260.

Second, Star Ratings affect the level of rebate received by plans that bid below their benchmarks for the contract year following the ratings year. Plans that earn an overall rating of 4.5 stars or higher receive a rebate of 70% of the amount by which their bid is lower than the benchmark, while plans that earn 3.5/4 stars or less than 3.5 stars can receive 65% and 50% rebates, respectively. 42 U.S.C. § 1395w-24(b)(1)(C)(v); 42 C.F.R. § 422.266(a)(2)(ii).

Each year, CMS circulates to plans (and displays on its website) a Technical Notes document that provides details about the current year's Star Ratings. (ROA.817.) Among other things, these Technical Notes include details about the measures that comprise the Star Ratings, how those measures are weighted, what the cut points for each measure are, and how CMS assesses each measure. (ROA.817–1030.) Plans are informed and have the opportunity to comment about the measures in upcoming Star Ratings through the Advance Notice process. *See* 42 C.F.R. § 422.164(c), (d); *see also* 42 U.S.C. § 1395w-23(b)(2).

**C.    One aspect of the Star Ratings system is a measurement of the insurer's ability to provide foreign-language interpreters to beneficiaries who are calling to obtain information.**

Each year since 2016, the Star Ratings have included a measure of how well MAO call centers process calls from beneficiaries with limited English language proficiency.  To provide notice to MAOs about how performance on this measure is evaluated, CMS publishes the Medicare Part C & D Call Center Monitoring Accuracy & Accessibility Study Technical Notes ("Call Center Technical Notes"), which describe the methodology of the Accuracy & Accessibility Study and how CMS uses the data to calculate each plan's raw score.[3]  (ROA.778–809.)  CMS also issues an annual memorandum to all MAOs that describes in advance how CMS will conduct its two separate call-monitoring studies:  the Accuracy & Accessibility Study and the Timeliness Study.  (ROA.768–77.)

The Call Center Technical Notes explain that the Accuracy & Accessibility Study is conducted through a random sample of anonymous calls made to each MAO's call center where the test caller has no advance knowledge of the call center's Limited English Proficiency or TTY services.

---

[3] This "Call Center Technical Notes" document is different from the annual Star Ratings Technical Notes document, which provides a high-level description of each measure in the Star Ratings.  (*See* ROA.778 (Call Center Monitoring Accuracy & Accessibility Study Technical Notes); ROA.817 (2025 Star Ratings Technical Notes).)

(ROA.780.) The Call Center Technical Notes also describe the protocol for testing foreign language interpreter accessibility and determining which of the three outcomes a test call may have, which are (1) connected, (2) complete, or (3) unsuccessful. (ROA.783.) CMS explains how it conducts test calls:

> If we are testing interpreter availability, we place the call in a foreign language and wait for the CSR [customer service representative] to bring an interpreter to the phone to assist the CSR in answering our introductory question. We permit eight minutes for the CSR to connect to an interpreter and answer our introductory question. An example of an introductory question is, "Are you the right person to answer questions about [Plan name's] health benefits?"

(ROA.783 (italics removed).) CMS then explains how it determines when a call is "connected" and when the foreign language interpreter availability measure is "complete":

> The call is considered connected when the caller connects with the CSR. The interpreter availability/LEP measure is considered completed when the CSR, via an interpreter, provides an affirmative response to the introductory question . . . within eight minutes. Alternatively, if a CSR happens to speak the foreign language we are testing, and that representative is able to answer the questions without an interpreter's assistance, this too would count as a completed interpreter availability/LEP measure outcome.

(ROA.783 (italics and bolding removed).) Finally, CMS explains that a call "will be scored as unsuccessful if we are not able to connect to a live CSR at

11

the plan *during that scheduled call* or if the CSR cannot assist us with our questions or cannot forward *our call* to someone who can assist." (ROA.782 (emphasis added).) A call will also be marked unsuccessful for various other reasons, including when there is a "Call Center disconnected call (including hanging up)." (ROA.785.)

The Technical Notes explain that scores on interpreter availability are combined with scores on TTY functionality for Star Ratings purposes. (ROA.780–81.) The raw score is calculated as "the number of completed contacts with the interpreter and TTY divided by the number of attempted contacts." (ROA.787.) "Completed contact with an interpreter is defined as establishing contact with an interpreter and confirming that the customer service representative can answer questions . . . within eight minutes." (ROA.787.)

## D.    An administrative appeals process exists to resolve disputes about Star Ratings.

CMS provides for two preview periods before the annual release of each Star Ratings in October. *See* 42 C.F.R. § 422.166(h)(2). During the first preview in August, CMS asks MAOs to closely review the Star Ratings methodology and their posted numeric data for each measure. The second preview in September includes any revisions made as a result of the first

preview and provides a preview of the preliminary Star Ratings for each measure, domain, summary rating, and overall rating. During the second preview, CMS asks MAOs again to closely review the methodology and their posted data for each measure, as well as their preliminary Star Ratings assignments. This is an informal administrative process in which MAOs send any comments or questions to CMS by email, and CMS responds in kind.

CMS regulations also provide for a quality bonus payment appeals process, a formal administrative appeal process after the Star Ratings have been published that allows MAOs to appeal their Star Ratings-impacted "quality bonus payment status determinations." 42 C.F.R. § 422.260(a). The "burden of proof is on the MA organization to prove an error was made in the calculation of the [quality bonus payment] status." *Id.* § 422.260(c)(2)(v).

## 2.    Factual Background

### A.    Humana fails four test calls during a Star Ratings measurement of its call center's foreign interpreter availability.

Like all MAOs, Humana received test calls under the Accuracy & Accessibility Study in 2024. Humana requested CMS review of four failed calls. (ROA.705, 721–22.)

In three of the calls, a customer service representative put the test caller on hold to get an interpreter, but the call center terminated each call before an interpreter joined. (ROA.721–22, 734.) And in another call, CMS's

contemporaneous data showed that the test caller was placed on a silent hold and the call was then disconnected after about five-and-a-half minutes. (ROA.705, 713.[4])  There is no evidence in the record that Humana attempted a callback in any of these instances.

### B. Humana seeks to invalidate the results of the four failed calls during the preview period.

During the preview period, Humana asked CMS to invalidate (i.e., remove from the dataset completely) all four failed calls, but CMS denied Humana's requests.  (ROA.714, 721, 740.)  Humana acknowledged "that dropped calls pose risks to beneficiary access" (ROA.722), but nonetheless urged CMS to exclude the three disconnected calls from the study because, Humana speculated, it would have been able to complete the measure successfully had it been permitted to call the test callers back, (ROA.722–23).

With respect to the first three challenged calls, CMS explained that the calls "were not disconnected by the CMS caller," and also noted that although Humana had suggested that it has a "procedure . . . to obtain the phone number of the prospective member and then to call them back," CMS "do[es] not allow callbacks from the plan as all questions should be answered in a

---

[4] The call log data is contained in an Excel spreadsheet that was part of the administrative record (ROA.713), and ROA.705 contains an excerpt from this data.

single call." (ROA.729.)  And with respect to the silent-hold call, CMS reviewed the call log and confirmed that (1) the test caller dialed the proper number, and (2) the call was answered by the call center's automated system. (ROA.713, 720.)  The data also showed that the call disconnected and that the caller did not initiate the disconnect.  (ROA.713, 715, 720.)

CMS ultimately published the Star Ratings on October 10, 2024. (ROA.13.)

### C.   Humana files a premature suit to challenge the scoring of the calls without first exhausting administrative remedies.

Before filing an administrative appeal, Humana challenged CMS's disposition of three of the calls (two of the disconnections and the silent-hold call) in a civil action filed in the Northern District of Texas in October 2024. *See Humana, Inc. v. U.S. Dep't of Health & Human Servs.*, No. 4:24-CV-1004-O (N.D. Tex.).[5]  This case was dismissed for lack of jurisdiction, however, based on the district court's determination that Humana had not exhausted administrative remedies as required by the Medicare statute.[6]  *See* Order,

---

[5] The Court may take judicial notice of the docket in this earlier lawsuit.  *See In re Deepwater Horizon*, 934 F.3d 434, 440 (5th Cir. 2019).

[6] Humana says this decision was "wrong." (Br. at 19 n.3.)  But Humana did not appeal the district court's decision, which is therefore preclusive as to the jurisdictional issues relating to the administrative exhaustion requirement that were decided therein.  *See Bank of La. v. FDIC*, 33 F.4th 836, 838 (5th Cir. 2022) (explaining that "preclusion principles . . . bar relitigation of the same jurisdictional issue decided").  Thus, to the extent that Humana

*Humana, Inc. v. U.S. Dep't of Health & Human Servs.*, No. 4:24-CV-1004-O (N.D. Tex. July 18, 2025).

### D.    Humana administratively appeals the agency's scoring of three of the failed calls.

After filing its first suit, Humana also sought internal agency review of the same three calls through the administrative appeals process. (Though it initially challenged four calls during the preview period, Humana dropped its challenge to one of the calls.) Humana first sought reconsideration by submitting a form and a letter explaining its position. (ROA.1031–35.) CMS responded with a Technical Report and appendices (ROA.1040–60), and the reconsideration official upheld CMS's initial determination (ROA.1038–39). Humana then sought review from a hearing officer. (ROA.1071.) After further briefing from CMS (ROA.1153–59), the hearing officer denied Humana's appeal (ROA.1160–64). The CMS Administrator then declined to review that decision, rendering it administratively final. (ROA.1165–67.)

### E.    In the current lawsuit filed after Humana exhausted its administrative remedies, the district court rejects Humana's claims and upholds the agency's scoring of the failed calls.

Following the hearing officer's decision and the district court's dismissal

---

argues that the internal administrative review process was "optional" (Br. at 19), that claim is barred by the outcome of the prior lawsuit where Humana litigated but ultimately lost on the issue of whether administrative exhaustion was required.

16

of its first lawsuit, Humana brought a renewed lawsuit—the current case. (ROA.10.)  With respect to the two disconnected calls, Humana alleged that CMS's no-callback policy violated the APA and the Medicare statute and was substantively arbitrary.  (ROA.35–36.)  Humana also alleged that the agency's disposition of the silent-hold call was arbitrary and capricious.  (ROA.36–38.)  The parties filed cross-motions for summary judgment on the administrative record.  (ROA.101, 1199.)  Humana also submitted with its motion a declaration from one of its employees—the Sanders Declaration, which discussed Humana's claimed practices for disconnected calls (ROA.166–68)—that it never submitted to the agency during the administrative process, but with an explanation that the declaration was provided merely to demonstrate certain elements of Humana's standing, (ROA.127 n.18).

The district court granted the agency's summary-judgment motion and denied Humana's.  (ROA.1317.)  With respect to the no-callback policy, the district court rejected all of Humana's challenges, holding that the notice-and-comment requirements of neither 42 U.S.C. § 1395hh(a)(2) nor the APA applied, that the no-callback policy was clear from agency guidance, and that the policy was not substantively unlawful.  (ROA.1322–28.)  The district court further held that CMS did not act arbitrarily and capriciously in determining that all three test calls at issue were correctly marked unsuccessful.

17

(ROA.1328–30.)  This appeal has followed.

## STANDARD OF REVIEW

In challenges to agency action, this Court reviews the district court's grant of summary judgment *de novo*, applying the standards of the APA. *OnPath Fed. Credit Union v. U.S. Dep't of Treasury, Cmty. Dev. Fin. Insts. Fund*, 73 F.4th 291, 296 (5th Cir. 2023).  An agency's action must be upheld unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); *see, e.g.*, *Sierra Club v. U.S. Dep't of Interior*, 990 F.3d 909, 913 (5th Cir. 2021).  Agency actions following a hearing will be upheld unless "unsupported by substantial evidence," 5 U.S.C. § 706(2)(E), which is "more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Knapp v. U.S. Dep't of Agric.*, 796 F.3d 445, 453–54 (5th Cir. 2015).  This Court may also affirm a summary judgment on any ground supported by the record.  *Abbvie, Inc. v. Murrill*, 166 F.4th 528, 537 (5th Cir. 2026).

## SUMMARY OF THE ARGUMENT

The district court correctly rejected Humana's challenge to the agency's scoring of the three test calls at issue.  As an initial matter, the Court need not consider the merits of Humana's challenge to the no-callback policy for the simple reason that the administrative record supports CMS's disposition of all

the test calls, and the no-callback policy was not determinative of that disposition. The administrative record showed that Humana hung up on both callers for whom it was trying to bring an interpreter onto the line and, additionally, the record contained no evidence that Humana either attempted a callback or decided not to do so because it had somehow realized the calls were from CMS. In this regard, Humana improperly relies on extra-record material—a declaration that was never submitted in the administrative proceedings—in its effort to reverse the failing scores of the two calls at issue by arguing that it would have called the callers back if not for the no-callback policy. But this evidence was not submitted to the agency and therefore nothing in the administrative record supports Humana's belated litigation argument that the calls would have been successful (via a hypothetical later callback) but for the no-callback policy.

In any event, the district court correctly concluded that the no-callback policy is lawful. The Medicare statutory provision requiring rulemaking for certain actions does not apply to Star Ratings measure specifications, which do not "govern" the "payment for services" or "eligibility . . . to furnish or receive services of benefits." And Humana has forfeited its claim—first raised on appeal—that CMS violated its own regulations in establishing the no-callback policy. Humana's arguments against the policy also lack factual and legal

19

support and are contradicted by the administrative record.

Finally, Humana's arbitrary-and-capricious challenge to the agency's disposition of the third failed call at issue—the silent-hold call—lacks merit. The record supports the agency's conclusion that Humana never put a representative on the line, and Humana failed to show otherwise.

This Court should affirm.

<u>**ARGUMENT AND AUTHORITIES**</u>

1. **The administrative record supports the agency's determination that the two disconnected calls were unsuccessful.**

The district court correctly held that the "outcome for the two dropped calls is not arbitrary and capricious." (ROA.1328.) This holding is consistent with Humana's concession below that "[i]f a call center drops a call and fails to call back . . . the call of course should be scored unsuccessful." (ROA.137; *see also* ROA.1328 n.34 (the district court's citation to this concession).) Humana even repeats that concession here. (Br. at 49.) The record before the agency confirms that Humana dropped the two calls, and there is no evidence in the record that Humana either attempted callbacks or decided not to do so on the basis of contemporaneous awareness that the calls were from CMS. The hearing officer found that "CMS provided evidence, through call logs and notes, that attempts were validly made [by test callers], yet contacts were not completed as outlined in the Technical Notes." (ROA.1164; *see also*

20

ROA.1163 ("Humana did not provide its own call logs to CMS, thus the CMS call logs are the only available empirical evidence associated with these calls.").)  And conversely, there is no evidence in the administrative record that Humana failed the test calls because of the no-callback policy; the evidence simply showed that Humana failed to satisfy the requirements for a successful call because it hung up on both callers while trying to get an interpreter on the line.

Humana's litigation argument that the no-callback policy somehow caused it to fail the test calls rests entirely on the Sanders Declaration.  (*See* Br. at 45 (citing ROA.166–68 (the Sanders Declaration) for the conclusion that "Humana's 2025 Star Ratings . . . were adversely affected by CMS' refusal to permit callbacks").)  But Humana never submitted this declaration to the agency during the administrative process and it is not part of the administrative record.  Yet that declaration is the only basis for Humana's after-the-fact argument that the no-callback policy allegedly caused Humana not to call back the disconnected test callers at issue here.  Humana could have submitted such a declaration to the agency during the administrative process; in fact, the declaration submitted in this case was identical (other than the execution date) to a declaration submitted to the district court in February 2025 as part of

Humana's first lawsuit. (ROA.1227 n.9.[7]) But for whatever reason, Humana did not put this evidence before the agency in the administrative process. And without the declaration or any similar evidence *in the administrative record*, there is no basis for this Court to consider the lawfulness of the no-callback policy, because there is no evidence in the administrative record linking the no-callback policy to Humana's failure to successfully resolve the test calls here. Indeed, Humana recognized as much below, because when it originally submitted the Sanders Declaration in the district court, it stated in a footnote that it did so *only* to establish its standing (which the agency was not challenging) and that the declaration therefore did not run afoul of the record rule when used for this limited jurisdictional purpose. (ROA.127 n.2.) On appeal, though, Humana attempts to obscure this point and now cites the Sanders Declaration as substantive evidence that the no-callback policy allegedly caused it to fail the test calls. (*See* Br. at 59 (citing the Sanders Declaration (ROA.168–68) for this concluding piece of Humana's challenge to the no-callback policy).)

That is improper. In an APA case, unlike in a typical summary-judgment matter, a court does not draw factual inferences in favor of the non-

---

[7] Humana had sought administrative review by a hearing officer five days earlier, on February 14, 2025. (ROA.1071.)

22

moving party or accept new evidence to make a *de novo* factual determination. The court's role, as the district court correctly noted, is instead to "determine whether the evidence *in the administrative record* permitted the agency to make the decision it did." (ROA.1321 (internal quotation marks and citation omitted; emphasis added)); *see also Yogi Metals Grp. v. Garland*, 567 F. Supp. 3d 793, 798 (S.D. Tex. 2021) ("[B]ecause of the district court's limited role, the standard set forth in Rule 56(c) does not apply to its summary judgment review." (internal quotation marks and citation omitted)), *aff'd*, 38 F.4th 455 (5th Cir. 2022).

The Sanders Declaration is indisputably not part of the administrative record. It is thus not among the materials that this Court should consider in resolving Humana's challenge.[8] Because the record before the agency shows

---

[8] Even if it does consider the Sanders Declaration, this Court should not draw factual inferences in Humana's favor from it. As the district court noted, even with the extra-record declaration considered, "CMS raises legitimate factual issues about whether Humana knew [the test] calls were from CMS." (ROA.1320 n.10.) If Humana did not know at the time of the test calls that the calls were coming from CMS, it cannot show that the no-callback policy caused it to fail the test calls because Humana claims that its policy against calling test callers back after a disconnection is a narrow exception to its general policy to return all disconnected calls. (*See* ROA.166, 168.) If Humana was unaware when the calls were placed that they were test calls, then Humana's failure to call back reflects a deviation from its alleged typical policy of attempting callbacks. And as CMS showed below, the two indicia that Humana claims to rely on to identify test calls were absent for the calls at issue here: neither caller had the chance to ask a scripted question, and Humana does not claim that it identified the incoming calls as test calls based on CMS having used the phone number before. (ROA.1226–28; *see also* ROA.167.) Therefore, even in a counter-factual scenario where the declaration is taken into account, it does not compel a conclusion that Humana purposefully did not attempt callbacks of the dropped calls at issue here.

no connection between the challenged no-callback policy and Humana's failure on the two disconnected calls, this Court can and should affirm the district court's holding with respect to those two calls on the basis that the record supports the agency's decision. If the Court follows this path, it may then pretermit entirely Humana's various substantive challenges to the no-callback policy.

**2.    Even if the Court does consider the substance of the no-callback policy, the district court correctly held that the policy is lawful.**

Even if this Court considers Humana's challenges to the no-callback policy, it should affirm the district court because—as the district court explained—the agency was not required to promulgate the policy via notice-and-comment rulemaking, the policy is not arbitrary and capricious, and Humana's remaining challenges lack merit.

**A.    The agency was not required to use notice-and-comment rulemaking to establish the no-callback policy.**

Humana argues that either the Medicare statute or regulations required notice-and-comment rulemaking to establish the no-callback policy. But as discussed below, these arguments are without merit. The Medicare statutory provision requiring rulemaking for certain policies does not apply to Star Ratings, which do not govern "payment for services" or eligibility to furnish or receive services or benefits. And because Humana presses its regulatory

argument for the first time on appeal, it is forfeited, and this claim is in any event unsupported by record evidence and legally meritless. Humana's remaining arguments that the district court erred are also unavailing.

### (1)    42 U.S.C. § 1395hh(a)(2) does not require notice and comment for Star Ratings measure specifications.

The requirement that certain agency actions be effectuated by a regulation promulgated through notice-and-comment procedures does not apply to Star Ratings measure specifications. The Medicare rulemaking provision states:

> No rule, requirement, or other statement of policy . . . that establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under this subchapter shall take effect unless it is promulgated by the Secretary by regulation . . . .

42 U.S.C. § 1395hh(a)(2).

The district court correctly analyzed the plain meaning of this statute to determine whether it applied to the Star Ratings issues raised by Humana, as informed by dictionary definitions of undefined terms. (ROA.1324.) The statute applies to rules, regulations, or statements of policy that "govern[]," the district court observed. (ROA.1324.) And to "'govern' means 'to prevail or have *decisive* influence; *control*.'" (ROA.1324 (citing Merriam Webster); *see also* Black's Law Dictionary (12th ed. 2024) (defining "govern" as "to control a

25

point in issue"). But the Star Ratings measure specifications do not "have decisive influence" or "control" over the payment for services or eligibility to furnish or receive services, the district court explained, nor do they alter the regulation that does permit CMS to exclude consistently low-performing plans and that thereby does "govern" eligibility in one respect. (ROA.1324.) At most, as the district court held, Star Ratings may "influence" those factors, but "[i]nfluencing is not the same as governing." (ROA.1324.)

a.      The district court was correct. For one, the quality bonus payments that are linked to the Star Ratings do not govern the "payment for services" (the language in § 1395hh(a)(2)) at all because MAOs cannot use quality bonus payments to pay for "services" as the Medicare statute uses that term. As the district court correctly held, the term "services" has a specific meaning in the Medicare program; not every payment made by or to a MAO is a "payment for services." (*See* ROA.1323 ("payments for services refers to the amounts Medicare must pay providers for furnishing covered services").) The "definitions" section of the Medicare statute uses the term "services" more than six hundred times, defining terms such as "inpatient hospital services," "extended care services," "home health services," and "physicians' services." 42 U.S.C. §§1395x(b), (h), (m), (q). The "scope of benefits" under both Part A and Part B also refers to the "entitlement to have payment made" for specified

26

"services." *See* 42 U.S.C. §§ 1395d, 1395k. And the "supplemental benefits" that a Medicare Advantage plan may offer may not be "benefits under original Medicare." 42 C.F.R. § 422.266(b)(1). MAOs are thus forbidden from using quality bonus payments to pay for "services" as Medicare defines that term; they must use them to pay for *other* things or reduce beneficiary premiums. The Star Ratings technical specifications, which influence quality bonus payment amounts, thus do not "govern[] . . . the payment for services." 42 U.S.C. § 1395hh(a)(2).

The district court confirmed as much with its explanation that "[r]egardless of how much money an MAO receives in quality bonus payments or in rebates because of its Star Rating, its obligations to pay providers of services remains the same." (ROA.1323.) All MAOs have the same statutory obligation to pay for "benefits under the original medicare fee-for-service program option." 42 U.S.C. § 1395w-22(a)(1)(A); *see also* 42 U.S.C. § 1395w-22(a)(1)(B). While Humana argues that "plans must use QBPs to provide additional supplemental benefits to enrollees" (Br. at 38), that is incorrect—plans can also use these payments to offer beneficiaries credits towards premiums, 42 C.F.R. § 422.266(b) (as Humana recognizes elsewhere, *see* Br. at 11). Regardless, Humana fails to address the fact that "supplemental benefits" are still not "services" under Medicare, and credits towards premiums likewise

27

are not.

Humana also claims that the Star Ratings-linked quality bonus payments "are 'payments' from the government to MA plans 'for services' to and for enrollees." (Br. at 38.)  But this contorts the meaning of the statutory phrase "payment for services" beyond recognition.  Humana's position is that the statutory phrase "payment for services" can mean a bonus payment from one party to another, as long as the party receiving the bonus then uses it to pay a third party "for services" of any variety.  But this construction is inconsistent with this Court's precedent, which affirms "that the ordinary meaning of a payment 'for' services delivered is a payment that is due 'on account of' delivery of those services."  *Matter of Speedcast Int'l Ltd.*, 76 F.4th 372, 377 (5th Cir. 2023) (quoting *Cohen v. de la Cruz*, 523 U.S. 213, 220 (1998)).

It is also inconsistent with ordinary usage.  If an employer gives an employee a bonus for good performance, and the employee uses part of that bonus to hire a plumber, no one would say that the bonus is a "payment" from the employer to the employee "for services" of a plumber.  The bonus is a payment from employer to employee for good performance, and the employer has nothing to do with the contractual relationship between the employee and the plumber.  The same is true of quality bonus payments—they are a bonus paid from the government to insurers that demonstrate high quality via the Star

28

Ratings metrics, not payments "due on account of delivery" of services, e.g., by some third-party medical provider to a beneficiary. *See Speedcast*, 76 F.4th at 377 (internal quotation marks omitted).

b. The Star Ratings measure specifications also do not govern the eligibility of anyone or any entity to furnish or receive services or benefits. The district court was correct in holding that the special enrollment period that allows beneficiaries to switch to a five-star plan at any point during the year "does not determine whether an MAO can participate in the Medicare Advantage program at all—only when prospective customers may enroll in their plan." (ROA.1324.) And Humana is simply wrong when it claims that a "plan with fewer than 5.0 Stars is denied 'eligibility . . . to furnish . . . services or benefits' to mid-year enrollees, plain and simple." (Br. at 39.) There are numerous triggering events that allow Medicare beneficiaries to enroll in any Medicare Advantage plan mid-year. *See, e.g.,* 42 C.F.R. §§ 422.62(b) (listing twenty-seven circumstances under which an individual may switch plans mid-year, including when "the individual meets such other exceptional circumstances as CMS may provide"); 422.62(a)(1) (beneficiary becomes eligible for Medicare outside the open enrollment period); 422.62(a)(3)(i) (Any person "enrolled in an MA plan may make an election once during the first 3 months of the year to enroll in another MA plan or disenroll to obtain Original

Medicare."). The fact that the regulation incorporates a plan's Star Ratings as just one among many possible factors relevant to a beneficiary's ability to switch plans mid-year does not mean that every last detail of the Star Ratings measure specifications "governs" the insurer's eligibility to furnish services or benefits.

So too with the possibility that CMS may choose to terminate a contract that has persistent low Star Ratings. (*See* Br. at 39–40.) Humana says the "Star Ratings thus control when a plan *may be* expelled." (Br. at 40 (emphasis added).) This concedes the point. Section 1395hh(a)(2) does not apply to something that *may* govern eligibility, depending on CMS's exercise of its own discretion. It applies to a "rule, requirement, or other statement of policy . . . that establishes or changes a substantive legal standard governing" the listed items. 42 U.S.C. § 1395hh(a)(2). The district court was correct that the "discretionary component of the low-performing provision and indirect nature of the Star Ratings metrics mean they are too attenuated to qualify as 'governing' eligibility for Medicare Advantage programs." (ROA.1324.) In the end, Humana cannot show that the Star Ratings govern eligibility when the regulations it cites vest the agency with discretion about whether to terminate a persistently low-performing contract.

> c.     Humana's expansive reading of § 1395hh(a)(2) also creates an

unnecessary conflict with another provision of the Medicare statute, at 42 U.S.C. § 1395w-23(b). If Humana's argument that quality bonus payments are payments for services were accepted, it would necessarily follow that the risk-adjusted Medicare Advantage capitation rate—the amount the government pays each Medicare Advantage plan for each enrollee—would also be said to govern the "payment for services" and therefore be subject to § 1395hh(a)(2). After all, that capitated payment is meant to reflect what the government would expect to pay to providers for the services they furnish to the Medicare beneficiary.

But the annual capitation rate is not subject to the requirement in § 1395hh(a)(2) that the Secretary act "by regulation." Instead, Congress established a separate notice-and-comment provision specific to the Medicare Advantage "annual announcement of payment rates." 42 U.S.C. § 1395w-23(b), (b)(2). When setting capitation rates, the agency is required to notify MAOs and give them an opportunity to comment, but the statute does not require action "by regulation" the way § 1395hh(a)(2) does. 42 U.S.C. § 1395w-23(b). Under Humana's sweeping interpretation of § 1395hh(a)(2), it is difficult to see how capitation rates would not also be required to be set "by regulation" under § 1395hh(a)(2), which would render the specific notice-and-comment provision of § 1395w-23(b) meaningless. "If a provision is

31

susceptible of (1) a meaning . . . that deprives another provision of all independent effect, and (2) another meaning that leaves both provisions with some independent operation, the latter should be preferred." A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 176 (2012). Had Congress thought the capitation rate was subject to the regulation requirements of § 1395hh(a)(2), it would not have needed to add § 1395w-23(b). Humana's reading of § 1395hh(a)(2) thus creates an avoidable conflict between two sections of the Medicare statute. The government's reading—and the district court's—properly avoids any such conflict.

In short, quality bonus payments linked to Star Ratings do not govern "the payment for services" or the "eligibility of . . . entities[] or organizations to furnish or receive services or benefits under this subchapter" so as to implicate § 1395hh(a)(2). Accordingly, as the district court held, the agency is not required to promulgate the Star Ratings measure specifications by regulation.

### (2)   Humana forfeited its argument that CMS violated its own regulations in establishing the no-callback policy.

Before the district court, Humana never alleged that CMS's adoption of the no-callback policy failed to comply with 42 C.F.R. § 422.164(d). Humana's complaint does not cite that regulation (or its Part D equivalent, 42 C.F.R. § 423.184) at all. (ROA.10–38.) And while Humana's summary-

judgment briefing cited § 422.164 in passing, Humana did not argue that the agency violated that regulation. (*See* ROA.135 (arguing instead that "notice-and-comment was required here under § 1395hh of the Medicare statute or § 553 of the APA").) Humana's argument below was that "CMS did not promulgate the no-callbacks [policy] using § 1395w-23(b), which does not apply in any event," (ROA.133), and Humana cited § 422.164(d)(1) as part of an argument that "the regulation does not apply on its own terms," (ROA.134). Thus, Humana raises the claim that CMS violated § 422.164(d) for the first time on appeal (Br. at 26), and has thereby forfeited it.

"A party forfeits an argument by failing to raise it in the first instance in the district court—thus raising it for the first time on appeal." *Rollins v. Home Depot USA*, 8 F.4th 393, 397 (5th Cir. 2021). Humana's complaint did not even attempt to show some entitlement to relief under a theory that the agency allegedly violated § 422.164. And Humana's bare citation to the regulation in its summary-judgment briefing was insufficient to remedy this pleading deficiency, particularly given that its argument below was merely that the "regulation does not apply on its own terms." (ROA.134.)

Humana, seemingly anticipating that the government would point out this forfeiture, makes a vague claim that "the Section 422.164(d) issue . . . featured prominently [in] the parties' briefing below." (Br. at 33.) This is not

the same as saying that Humana argued below that CMS violated § 422.164(d) in promulgating the no-callback policy.

In fact, it was CMS that raised § 422.164(d) below. First, CMS cited § 422.164(d) because that provision implements the special notice-and comment provision of 42 U.S.C. § 1395w-23(b) for certain changes to Star Ratings made after 2018.[9] (ROA.1233.) Second, as part of an APA harmless-error argument, CMS argued that Humana could have submitted comments any time since 2018 expressing opposition to the no-callback policy via the notice-and-comment process made applicable by § 422.164(d) to Star Ratings changes, and that its failure to do so, coupled with Humana's assertion that it was aware of the no-callback policy, demonstrates that any procedural error was harmless under the APA. (ROA.1239–40.) These references to § 422.164 below do not amount to a claim—much less a claim *by Humana*—that CMS's no-callback policy was subject to and violated the regulatory process addressed in § 422.164.

---

[9] Humana wrongly asserts that 42 C.F.R. § 422.164(d) implements 42 U.S.C. § 1395hh(a). (Br. at 31.) This claim appears to be rooted in Humana's observation that CMS cites § 1395hh as statutory authority when it promulgates regulations. (Br. at 33.) But § 1395hh is merely the general Medicare rulemaking statute requiring the Secretary to "prescribe such regulations as may be necessary to carry out the administration of the insurance programs under this subchapter." 42 U.S.C. § 1395hh(a)(1). That a regulation is "necessary to carry out the administration" of the Medicare program does not imply that it "establishes or changes a substantive legal standard" enunciated in § 1395hh(a)(2). To put it another way: a regulation *authorized* by § 1395hh(a)(1) is not necessarily *required* under § 1395hh(a)(2).

Humana claims that "CMS argued that Section 422.164(d)(1) applies to the no-callbacks rule, allowing the agency to promulgate the rule through the informal procedures specified in 42 U.S.C. § 1395w-23(b)(2)." (Br. at 33 (citing ROA.1233, 1237, 1239, 1305, 1310).) But none of Humana's record citations supports this proposition. In its summary-judgment briefing below, CMS explained that § 422.164 was not inconsistent with 42 U.S.C. § 1395w-23(b)(2) (ROA.1239); showed that Humana had not challenged § 422.164 as inconsistent with the statute (ROA.1237); and pointed to a statement in the preamble accompanying § 422.164 in which the agency said the regulation "made it unnecessary to 'codify a list of measures and specifications in regulation text,'" (ROA.1233). And in a reply below, CMS cited a Federal Register preamble that itself cited § 422.164 to show that the agency did not modify the Star Ratings measure specifications when it adopted the minimum standards requirement at 42 C.F.R. § 422.111(h) (ROA.1305), and accurately characterized Humana's arguments about § 422.164 as "amount[ing] to an argument that § 422.164 is inconsistent with the APA, a claim that does not appear in Humana's complaint," (ROA.1310).

Humana's citation to its own briefing below also does not show that it claimed in the district court that the agency violated § 422.164. Take, for example, Humana's assertion on appeal that it "contended that *Section*

35

*422.164(d)(1) and its incorporation of the informal notice process under Section 1395w-23(b)(2)* is 'not the appropriate vehicle for notifying the public and taking comment on the no-callbacks rule.'" (Br. at 33–34 (citing ROA.134) (emphasis added).) This is a mischaracterization of Humana's opening brief in the district court, in which Humana said that "§ 1395w-23(b)(2) is manifestly not the appropriate vehicle for notifying the public and taking comment on the no-callbacks rule." (ROA.134.) Humana did not argue that the regulation was the wrong vehicle—it pointed only to the statute. Further down that same page, Humana merely observed that "CMS pointed to 42 C.F.R. § 422.164(d)(1)" in its own briefing in the previous lawsuit—an accurate characterization of CMS's reference to the regulation, but far from a showing that CMS argued that it promulgated the no-callback policy via that regulation. (ROA.134.)

Further evidence of Humana's forfeiture of the § 422.164 argument lies in the fact that the district court did not address it. Humana complains that the district court "misconstrued [its] principal argument as a contention that 'CMS never announced or sought comments' on the no-callbacks rule." (Br. at 34 (citing ROA.1326).) The district court did not misconstrue Humana's argument—it understood Humana's claims perfectly well and addressed them in a detailed and thoughtful opinion. Humana claimed below that CMS had

36

violated the Medicare statute and the APA, and it had also argued that CMS's policy was substantively arbitrary. The district court addressed those arguments. As shown above, Humana now claims that it presented an argument to the district court that it is in fact making for the first time in this Court. The district court's opinion does not discuss any § 422.164-based argument because Humana never argued to the district court that the agency had violated that regulation. (ROA.1317–30.)

Humana's failure to even mention in its complaint the regulation that it now insists CMS violated, coupled with Humana's mischaracterization of the briefing below, makes plain that Humana did not preserve any argument that CMS violated § 422.164(d).

### (3) Humana's argument that CMS violated its own regulations is factually unsupported.

Even if this Court reaches Humana's argument that CMS violated § 422.164(d), it should reject that claim because the record contains no factual support for Humana's claim that CMS changed its policy after 2018 (when § 422.164 took effect, *see* 83 Fed. Reg. at 16532–33, 16725) and adopted the no-callback policy in violation of that regulation.

For one thing, Humana nowhere established *when* or *how* CMS adopted the no-callback policy. Although not entirely clear, Human may be attempting to suggest that the no-callback policy was "first adopted . . . in 2018" (Br. at

28)—but the citation Humana gives for this is "83 Fed. Reg. at 16543," and that page of the Federal Register says nothing about the no-callback policy. Moreover, if, as Humana now suggests, CMS had adopted the policy only in 2018, there would presumably be some evidence of its adoption at that time. The annual Advance Notice and Rate Announcement are public documents that CMS posts online upon release, for example. *See, e.g.,* 2027 Advance Notice, *available at* https://www.cms.gov/files/document/2027-advance-notice.pdf. But Humana does not show that CMS added the no-callback policy via this process at all, nor does it cite any document supporting its assertions.

In particular, Humana fails to show that CMS added the no-callback policy at any point after the agency adopted § 422.164(d) in 2018. This matters because that regulation is not retroactive—the agency was not obligated to re-promulgate Star Ratings technical specifications that already existed at the time of the regulation. Rather, as explained in the Federal Register when § 422.164 was promulgated, the agency stated that it "will not codify a list of measures and specifications in regulation text in light of the regular updates and revisions contemplated by the rules" it finalized. 83 Fed. Reg. at 16537. Because Humana failed to argue this issue in district court or present it to the agency in the administrative process, the record below is silent on when CMS

38

adopted the no-callback policy. Humana therefore cannot show that the policy was adopted in violation of CMS's 2018 regulation (§ 422.164) if it cannot even show that the regulation CMS allegedly violated *existed* when the agency adopted the policy that allegedly violated it.

Underscoring the lack of record evidence on this point, Humana attempts to introduce materials that were not before the district court. (*See* Br. at 29 (citing external link to the 2018 Star Ratings Technical Notes).[10]) "[O]rdinarily a court of appeals should not take judicial notice of documents on an appeal which were available before the district court decided the case but nevertheless were not tendered to that court." *Craig v. Bisignano*, 157 F.4th 773, 774 (5th Cir. 2025) (internal quotation marks and citation omitted). This Court has therefore "excluded filings attached to briefs that were not available to the district court and offered by a party for the first time on appeal." *Id.* at 775. This Court should decline to consider Humana's improper attempt to supplement the record with a hyperlink to materials it could have provided at earlier stages of this dispute.

---

[10] Even this document offers no insight into when the no-callback policy was added. The district court's holding that the no-callback policy is "clear from" the guidance refers not to the Star Ratings Technical notes but to the Call Center Technical Notes and the Call Center Monitoring Memo. (*See* ROA.1326 (citing ROA.785, 752).) Humana never offered historical versions of those documents to the district court and does not provide them to this Court.

39

Humana's extra-record materials also contradict the record on appeal regarding the history of the Interpreter Availability measure. Again, Humana suggests in its brief on appeal that CMS first adopted this measure in 2018. (Br. at 28.) But the record is clear that it dates to at least 2016, a point Humana did not contest below. (*See* ROA.1270 (Humana's acknowledgement that the Accuracy & Accessibility Study began in 2016); *see also* ROA.957 (Star Ratings Measuring History chart with references to "Foreign Language Interpreter and TTY Availability" dating back to 2012).) Moreover, Humana offers no evidence that CMS ever changed the specifications for the Foreign Language Interpreter Availability measure to add a no-callback policy. Nothing in the record indicates that plans have *ever* been allowed to achieve success following a disconnection by calling the CMS test caller back.

This should settle the matter. Humana alleges that CMS changed its policies in violation of a regulation enacted in 2018, but it offers no evidence that the policy changed *at all*, much less that it changed at a specific time after 2018 in violation of the regulation. Humana could have offered such evidence—if it existed[11]—to the district court. Its failure to do so cannot be

---

[11] The evidence does not, in fact, exist. CMS has never permitted plans to satisfy the Foreign Language Interpreter Availability measure through the means of a callback, but what matters here is that that record is bereft of any evidence one way or another.

40

cured on appeal.

### (4)     Humana's remaining arguments lack merit.

Humana also urges this Court to hold that the district court committed a number of other errors.  It argues that the district court erred in holding that the no-callback rule is evident from the guidance, (Br. at 34–37), and it takes issue with the district court's holding that the Star Ratings measure specifications do not implement a regulation establishing minimum compliance standards for call centers, (Br. at 41–44).

But as an initial matter, these asserted errors by the district court have no bearing on the outcome of this case.  The relevance of Humana's argument that the district court erred in finding the no-callback policy plain from the relevant guidance is unclear given Humana is arguing that it was aware of the policy (including through the Sanders Declaration).[12]  (Br. at 35.)  And Humana's argument that the Star Ratings implement the minimum standards regulation at 42 C.F.R. § 421.111(h)(1)(iii) was tied to a claim that it does not pursue on appeal:  that the APA required the agency to adopt the no-callback

---

[12] In the first lawsuit, in response to CMS's arguments that Humana knew in advance from the guidance that callbacks were forbidden, Humana responded that "CMS appears to be confused" about the nature of Humana's position.  Pls. Consolidated Reply in Support of Mot. for Summ. J. and Opp. to Def.'s Mot. for Summ. J. at 17, *Humana, Inc. v. U.S. Dep't of Health & Human Servs.*, No. 4:24-CV-1004-O (N.D. Tex. Feb. 7, 2025).  Humana clarified: "Our position is not that no-callback policy is unlawful because it was secret." *Id.*

policy via notice-and-comment. (*See* ROA.132 ("the no-callbacks rule amends 42 C.F.R. §[] 422.111(h)").) These arguments are nonetheless meritless for the reasons below.

a.    Humana takes issue with the district court's determination that the no-callback policy is "clear from . . . the guidance" (Br. at 34; ROA.1326), arguing that this "was a *sua sponte* invention of the district court itself" and was wrong on the merits (Br. at 36–37).

But both contentions fail. CMS argued in the district court that the "no-callback policy is plain from the guidance." (ROA.1233 n.12; *see also* ROA.782, 785.) Humana ignores this portion of the agency's briefing below in arguing that the district court *sua sponte* arrived at this determination.

The district court was, in any event, correct, and Humana fails in its attempt to undercut the district court's explanation that the no-callback policy is apparent from the Technical Notes. The district court held that the guidance's repeated use of the singular "call" was evidence that callbacks were not permitted because the guidance might otherwise be expected to use the plural "calls." (ROA.1326.) Humana's response is to cite the Dictionary Act for the proposition that, for statutory construction purposes, "the singular includes the plural." (Br. at 36.) But that fails to engage with the district court's reasoning.

42

Specifically, the Dictionary Act's generic discussion of the singular and the plural in the context of statutory interpretation does not stand for the proposition that with respect to the Star Ratings interpreter measurement, "if you can satisfy the measure on an *incoming* call, you can also satisfy it via a subsequent *outgoing* call." It is clear from the context of the Technical Notes that the word "call" refers to the test call from CMS to the MAO's call center. (*See, e.g.*, ROA.782 (discussing the various components of the call placed by the test caller).) This guidance would be incoherent as applied to a callback and cannot reasonably be construed to contemplate that a "call" from a beneficiary to a call center would be considered successful if a subsequent call from the call center to the beneficiary results in contact with an interpreter. If callbacks were allowed, one would expect the relevant guidance to cover the details of what is necessary for a "successful" callback, but of course the guidance does not do so. Humana also has no explanation for how the guidance stating that a call will be marked unsuccessful in the event of a "Call Center disconnected call (including hanging up)" could be read to permit callbacks. (ROA.785.) This guidance indicates that CMS will mark a call unsuccessful upon disconnection; if callbacks were allowed, the guidance would have to indicate how long the test caller should wait before marking a call unsuccessful. The district court's holding about the use of the word

"caller" in the Technical Notes makes a similar point: the Technical Notes would not make sense if they were read to allow callbacks. (ROA.1327.) Critically, Humana nowhere offers an affirmative case for why it believes the most natural reading of the guidance is that callbacks are allowed. It says that the district court got the guidance *wrong*, but it offers no explanation for why its position is *right*.

b.      Humana is also incorrect that the Star Ratings enforce the minimum standards regulation. (*See* Br. at 41–44.) In 2021, CMS promulgated a regulation establishing minimum standards for MAO call centers. Under this regulation, "interpreters must be available for 80 percent of incoming calls requiring an interpreter within 8 minutes of reaching the customer service representative and be made available at no cost to the caller." 42 C.F.R. § 422.111(h)(1)(iii)(B); *see* 86 Fed. Reg. 5864, 6005–08 (Jan. 19, 2021). As discussed previously, the Foreign Language Interpreter Availability measure has been a component of the Star Ratings continuously since 2016. Humana nonetheless urged the district court to hold that the pre-existing Star Ratings measure specifications somehow enforce the later 2021 minimum standards regulation.

The district court correctly held that the "Star Ratings do not enforce the minimum standards." (ROA.1325.) "This is evident," the district court

44

explained, "from the different standards required for an MAO to receive a 5.0 Star Rating and for an MAO to be compliant." (ROA.1325.) A call center, like Humana's, that provides an interpreter for more than 80% but fewer than 100% of incoming calls is compliant under § 422.111(h)(1)(iii), but it does not necessarily receive a 5.0 score on the relevant Star Ratings measure specification. The 80% cutoff in the minimum standards regulation is incoherent as applied to the Star Ratings, which grade plans on a curve.

Other factors further make it evident that the minimum standards regulation is separate from the Star Ratings. In the 2021 rulemaking adopting the minimum standards regulation, CMS *separately* (about 80 Federal Pages earlier), included a section entitled "Adding and Updating Measures (§§ 422.164 & 423.184)." 86 Fed. Reg. at 5918. In that section, CMS discussed its "Proposed Measure Updates," *id.*, and "Proposed Measure Additions," *id.* at 5921, and concluded with a table entitled "New and Revised Individual Star Ratings Measures for Performance Periods Beginning on or After January 1, 2022," *id.* at 5926. That table does not mention the call center measures at all—further evidence, if any were needed, that the minimum standards regulation does not modify the Star Ratings measure specifications.

Humana's arguments to the contrary are unavailing. It first claims that the "Call Center Monitoring" study cross-references 42 C.F.R. § 422.111(h)(1),

45

which deals with provision of specific information to current and prospective enrollees via a customer service call center.  (Br. at 41, 42 (citing ROA.256, 746, 768).)  The minimum standards regulation is a part—but only a part—of that regulation.  Similarly, gathering data for the Star Ratings is a part—but only a part—of CMS's call center monitoring activities.

CMS in fact conducts two separate call center studies annually:  the Timeliness Study and the Accuracy & Accessibility Study.  (*See* ROA.746.) None of the data gathered in the Timeliness Study contributes to the Star Ratings; some Timeliness Study data appears on the display page.  *See* 42 C.F.R. § 466.162(a).  "The Accuracy & Accessibility Study measures Part C and Part D prospective beneficiary call center telephone lines to determine (1) the availability of interpreters for individuals, (2) teletypewriter (TTY) functionality, and (3) the accuracy of plan information provided by customer service representatives (CSRs) in all languages." (ROA.746–47 (italics and bolding omitted).)  Information accuracy is not a component of the Star Ratings; it was a measure that appeared only on the display page as recently as 2014.  *See* 42 C.F.R. § 422.162(a); *see also* ROA.957.  The data gleaned from the Accuracy & Accessibility Study may be "reflected in compliance actions, public reporting, *or* star ratings."  (ROA.747 (italics added, bold omitted).) Again, Star Ratings are a component of the Accuracy & Accessibility Study,

but the study serves other purposes—to wit, compliance actions and public reporting. It is thus unsurprising and irrelevant to the issues at hand that a memorandum describing the Accuracy & Accessibility Study would cite a regulation broadly describing a MAO's regulatory obligations with respect to its call centers.

Next, Humana quotes a portion of the Federal Register from 2020— before CMS promulgated the minimum standards regulation—responding to a comment suggesting that the agency consider setting Star Ratings measures cut points geographically. (Br. at 43.) In its response, CMS stated in part that "many measures," including call center measures, "are based on compliance with Medicare rules and requirements." 85 Fed. Reg. 33,796, 33,834 (June 2, 2020). Humana argues that this isolated Federal Register statement, which predates the adoption of the minimum standards regulation in 2021, somehow indicates that the agency has been using the Star Ratings to enforce compliance all along. But it offers no explanation for this position. CMS has repeatedly explained that the purpose of Star Ratings is to provide information "that is a true reflection of the plan's quality and encompasses multiple dimensions of high quality care." 83 Fed. Reg. at 16520. A statement predating the adoption of § 422.111(h)(1)(iii) cannot shine any light on the relationship between that regulation and the Star Ratings measure specifications.

The only other purportedly "authoritative statement[] of CMS itself" that Humana offers is a misleadingly out-of-context partial quotation from the frequently asked questions portion of the Technical Notes for the Accuracy & Accessibility Study.  (Br. at 43 (citing ROA.808).)  Humana says that "CMS has stated explicitly that the purpose of the Accuracy & Accessibility Study is 'to determine if [plans are] compliant with 42 C.F.R. § 422.111(h)(i)(iii)."  (Br. at 43 (citing ROA.808, alterations in brief).)  Not so.  As the record clearly shows, the FAQ at issue was, "How was *compliance* determined for the 2024 Accuracy & Accessibility Study?"  (ROA.808 (emphasis added).)  In response to that question, CMS said:  "Interpreter Availability was tested to determine if the services were compliant with 42 C.F.R. §§ 422.111(h)(1)(iii) and 423.128(d)(1)(iii), which require interpreters to be available for 80 percent of incoming calls requiring an interpreter within 8 minutes."  (ROA.808.)  As we have already explained, § 422.111(h)(1)(iii) sets a minimum standard for compliance, so the compliance portion of the Accuracy & Accessibility Study tests against that regulation.  But the Accuracy & Accessibility Study tests more than compliance, and CMS's response to a question about compliance specifically says nothing about the Star Ratings.

In short, the district court was correct in holding that the minimum standards regulation promulgated in 2021 is distinct from CMS's longstanding

48

use of call center data in the Star Ratings. Humana's arguments to the contrary misread the record and rely on inapposite statements from the Federal Register.

c.      One final point: Humana presses the argument that the no-callback policy is "substantive" as § 422.164(d) uses that term. (*See* Br. at 33.) Because CMS did not adopt the no-callback policy via § 422.164(d), it is irrelevant whether the policy would be "substantive" or not. But Humana is incorrect regardless. The no-callback policy does not change the numerator or the denominator of the Foreign Language Interpreter Availability measure; with or without the policy, the measure is calculated as the number of successful calls divided by the number of total calls. (ROA.902.) And the regulatory definition of "non-substantive measure specification updates" is also non-exhaustive, *see* 42 C.F.R. § 422.164(d)(1) ("Non-substantive measure specification updates *include* those that—") (emphasis added), with the no-callback policy providing at most an "additional clarification[]" of what constitutes an unsuccessful call, *id.* at § 422.164(d)(1)(iv).

## B.    The no-callback policy is not arbitrary.

For Humana to prevail on its claim that the no-callback policy is substantively arbitrary, it must show that the policy "bears no 'rational relationship' to the goals of the rule.'" (ROA.1327 (quoting *Mexican Gulf*

*Fishing Co. v. U.S. Dep't of Com.*, 60 F.4th 956, 973 (5th Cir. 2023)).) Humana does not address the district court's explanation for its decision, which was that the principle that "answering questions in a single call demonstrates better service because it avoids the risks of inconveniently timed follow-up calls or an inability to reach those who dialed from private numbers" is a rational consideration. (ROA.1327.) Under the deferential arbitrary and capricious standard, Humana's failure to address the district court's reasoning is sufficient for this Court to uphold its treatment of the issue. The arguments that Humana does make are, additionally, unavailing.

Humana's claim that the Foreign Language Interpreter Measure "is not designed to evaluate" disconnections, for example, finds no support in the record. (Br. at 45.) The call center measures are part of the "Customer Service" domain of the Star Ratings. (ROA.821.) Customer Service measures are meant to measure the quality of a MAO's ability to provide help to beneficiaries who need it. Anyone who has called a customer service phone line, been abruptly disconnected, and later received a call (perhaps at an inconvenient time) would likely agree that a call center that does not drop calls and provides answers on a single call provides better customer service. Humana agrees: "Of course, a customer service call that is resolved in a single call without a disconnection is preferable to a disconnection followed by a

callback." (Br. at 48.) The call center measures capture a plan's ability to provide a service that is important to Medicare beneficiaries.

Humana responds that the "industry standard practice" is to call back. (Br. at 45.) There is no evidence in the record about "industry standard practice"—that claim is based on nothing more than Humana's say-so. And, as already discussed, Humana's insistence that it follows the purported "industry standard" except when the call is from CMS is belied by these two calls; even the supplemental declaration Humana inappropriately seeks to rely on does not show that Humana contemporaneously knew that the disconnected calls were from CMS, and Humana also unquestionably failed to attempt a callback. (*See* p. 23 n.8, *supra*.) The Star Ratings are designed to facilitate beneficiaries' comparisons among plans. Humana offers no explanation for why it is arbitrary and capricious for an agency's quality rating system to reward plans that more frequently achieve what Humana itself acknowledges are "preferable" outcomes.

Finally, there is no basis for Humana's "double-weight[ing]" argument. (Br. at 48.) Humana posits that, because another CMS call center study (the Timeliness Study) measures average hold times and disconnect rates, CMS may not even consider disconnections in the Accuracy & Accessibility Study. The problem with this argument is that the Timeliness Study does not

51

contribute any data to the Star Ratings. Instead, a Star Ratings display page shows some data that CMS gathers from this study. *See* 42 C.F.R. § 466.162(a). The "Calls Disconnected When Customer Calls Health Plan" measure that Humana cites is a display measure only; it is not a component of the Star Ratings at all. (*See* Br. at 48; *see also* ROA.581 ("Measure codes that begin with DM are display measures which are posted on CMS.gov").) It also bears noting that the Accuracy & Accessibility Study applies to calls from prospective enrollees, and the Timeliness Study applies to calls from current enrollees. (ROA.746.) The studies measure different populations and CMS uses the data for different purposes.

Humana nonetheless insists that if CMS conducts a study explicitly measuring disconnection rates for current enrollees but does not incorporate that data into the Star Ratings, it is forbidden to *even consider* disconnections in the Star Ratings as part of a different study assessing interpreter availability for prospective enrollees. The arbitrary and capricious standard does not require such an absurd result. Humana concedes that call disconnections matter to prospective enrollees, and it is thus reasonable for the agency's quality rating system to incorporate standards that award lower scores to MAOs whose call centers abruptly hang up on prospective beneficiaries.

**3.      CMS correctly determined that the third, silent-hold call was unsuccessful.**

In addition to the two calls discussed above that Humana disconnected, Humana also argues that the district court erred in refusing to invalidate the call where the test caller dialed the number for Humana's call center, waited through the automated menu, and remained on the line until Humana disconnected the call after about five and a half minutes of complete silence. (Br. at 50.)  But as with the two disconnected calls, Humana marshals no argument that a Medicare beneficiary who experienced this "silent treatment" from a call center would describe it as a successful experience.

Humana's challenge to this third calls fails because Humana's core premise—that the test caller was mistaken in believing he or she was on a silent hold—is unsupported by the record. (Br. at 50.)  The *only* evidence in the record about this call is the call log and the caller's notes. (*See* ROA.1329 (explanation from the district court that "there is no proof that Humana connected the caller to a live customer service representative").)  Humana could have provided evidence to the agency that the caller's belief was mistaken, and that a live representative was in fact on the line.  But Humana cannot belatedly amend the record via its brief by saying it "would have readily produced" evidence there was a representative on the line (Br. at 54), particularly given that CMS noted in its Technical Report to the

53

reconsideration official that "Humana provides no call recordings, [and] there is no indication that there may have been a live person speaking at any point" (ROA.1127). The "burden of proof is on the MA organization to prove an error was made in the calculation of the [quality bonus payment] status." 42 C.F.R. § 422.260(c)(2)(v).[13] Nothing more needs to be said: Humana failed to meet its burden of proof, and the hearing officer reasonably affirmed the initial determination. (ROA.1163.)

Humana's argument that the agency gave different reasons for its decision simply ignores the hearing officer's decision, which is the final decision of the agency. (*See* Br. at 53–54 (citing ROA.175, 187).) The hearing officer explained that she "reviewed and considered all of the supporting details for the plan's informal hearing on the record request, including the [quality bonus payment] determination, the evidence and findings upon which the initial determination was based, and the additional information submitted by Humana." (ROA.1163.) "In the case of the calls at issue, CMS provided

---

[13] This Court should reject Humana's argument that unsworn "written statements of senior Humana officials submitted to the agency" constitute evidence that a Humana customer service representative joined the line before the disconnection. (Br. at 53.) For one thing, Humana never quotes any of these "statements of senior Humana officials," so it is unclear to what it is referring. And even if the unspecified "statements" were accepted as evidence, Humana nowhere explains why it was arbitrary and capricious for the hearing officer to determine that they were insufficient to constitute a preponderance of the evidence, particularly when contradicted by the contemporaneous notes and call logs that CMS provided.

54

evidence, through call logs and notes, that attempts were validly made [by test callers], yet contacts were not completed as outlined in the Technical Notes." (ROA.1164.[14]) And the Technical Notes cover this situation precisely: "A call is classified as unsuccessful for any of the following reasons . . . Call Center disconnected call (including hanging up)." (ROA.785.) Humana would have this Court hold that if a call center never puts a live person on the line, it cannot fail an interpreter availability test call because there is no one to whom the test caller can speak in a foreign language. Unsurprisingly, this absurd position was not accepted by the hearing officer or the district court, and this Court should likewise decline Humana's invitation to do so.

Humana also finds no support in *UnitedHealthcare Benefits of Texas, Inc. v. CMS*, No. 6:24-CV-357-JDK, 2024 WL 4870771 (E.D. Tex. Nov. 22, 2024), a decision that in any event did not bind the district court and does not bind this Court. (Br. at 52–53.) The plaintiff in that case, unlike Humana here, introduced evidence—a call recording—showing that the call connected to a live representative. *See UnitedHealthcare*, 2024 WL 4870771, at \*4. And the court's factual determination that the call connected with such a representative

---

[14] Humana claims that its citations to ROA.1158 and ROA.1159 reflect statements by the hearing officer. (*See* Br. at 54 ("The hearing officer took a different tack . . . .").) They do not. The cited pages are part of CMS's memorandum to the hearing officer. (*See* ROA.1153–59.)

was critical to its holding. *See id.* There is nothing supporting an analogous factual finding here, much less the required preponderance of the evidence. Additionally, the district court carefully and correctly explained why *UnitedHealthcare* was distinguishable and did not support Humana's claim. (ROA.1328–29.)

The hearing officer also rationally explained the decision to affirm CMS's initial determination that the silent call was unsuccessful. According to the record and the hearing officer's decision, Humana hung up on a caller without ever putting a live person on the line. (ROA.1163–64.) And the district court appropriately recognized that the record supported this finding: the district court explained that "there is no proof that Humana connected the caller to a live customer service representative," and thus "the call was rated as unsuccessful at stage two" (i.e., the "connect") phase, "not at stage three as in *UnitedHealthcare*." (ROA.1329.) Humana's insistence that the district court's decision relies on post-hoc reasoning is meritless and ignores the record. (*See* Br. at 55.)

## CONCLUSION

The district court's judgment should be affirmed.

Respectfully submitted,

Ryan Raybould
United States Attorney

Of Counsel:

MICHAEL B. STUART
General Counsel
ELIZABETH C. KELLEY
Deputy General Counsel
Chief Legal Office for CMS
BETSY M. PELOVITZ
Associate General Counsel
JOCELYN S. BEER
Acting Deputy Associate General
Counsel for Litigation
ALEXANDER R. WHITE
Attorney

Office of the General Counsel,
U.S. Department of Health and
Human Services

/s/ Brian W. Stoltz
Brian W. Stoltz
Assistant United States Attorney
Texas Bar No. 24060668
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone:  214-659-8626
Facsimile:   214-659-8807
brian.stoltz@usdoj.gov

Attorneys for Appellees

## CERTIFICATE OF SERVICE

This document is being filed electronically and served on the other parties through the Court's ECF system.

I further certify that (1) any required privacy redactions have been made; (2) the electronic submission is an exact copy of any paper document; and (3) the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.

/s/ Brian W. Stoltz
Brian W. Stoltz
Assistant United States Attorney

## CERTIFICATE OF COMPLIANCE

1.    This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,944 words according to the Microsoft Word word count tool.

2.    This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Calisto MT font.

/s/ Brian W. Stoltz
Brian W. Stoltz
Assistant United States Attorney