No. 25-11302

*In the*

# United States Court of Appeals

*for the*

# Fifth Circuit

---

Humana Inc. *and* Americans for Beneficiary Choice,

*Plaintiffs-Appellants,*

– v. –

United States Department of Health and Human Services;
Centers for Medicare and Medicaid Services;
Robert F. Kennedy Jr., *in his official capacity as Secretary of Health and Human Services*; Mehmet Cengiz Oz, *in his official capacity as Administrator of the Centers for Medicare and Medicaid Services*,

*Defendants-Appellees.*

---

On appeal from a final judgment of the
United States District Court for the Northern District of Texas
Case No. 4:25-cv-779 (Chief District Judge Reed O'Connor)

---

## REPLY BRIEF FOR PLAINTIFFS-APPELLANTS

---

Edward A. Day
  *Winston & Strawn LLP*
  *300 N. LaSalle Drive*
  *Chicago, IL 60654*
  *(312) 558-8106*

Michael B. Kimberly
  *Winston & Strawn LLP*
  *1901 L Street NW*
  *Washington, DC 20036*
  *(202) 282-5096*

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF INTERESTED PARTIES

**No. 25-11302**
***Humana Inc., et al. v.***
***U.S. Department of Health & Human Services, et al.***

The undersigned certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case.

**Appellant** Humana Inc. (Humana) is a publicly traded company with no parent corporation. There is no publicly held corporation that owns 10% or more of Humana's stock. Humana is financially interested in the outcome of the case.

**Appellant** Americans for Beneficiary Choice (ABC) is a non-profit, tax-exempt organization incorporated in Texas. It has no parent organization and does not issue stock. ABC is a membership organization representing the interests of insurance agent and brokers, field marketing organizations, and Medicare Advantage enrollees, some of whom are financially interested in the outcome of the case.

**Counsel for appellants** are Michael B. Kimberly and Edward A. Day of Winston & Strawn LLP. Additionally, John T. Sullivan, formerly of Winston & Strawn LLP, represented appellants in the district court.

/s/ *Michael B. Kimberly*

i

## TABLE OF CONTENTS

Introduction ................................................................................ 1

Argument .................................................................................... 2

I.  The no-callbacks rule was unlawfully adopted without notice-and-comment rulemaking................................................................. 2

    A.  The no-callbacks rule determined the outcome of Humana's appeal with respect to D0900533 or D1100955 ................................. 2

    B.  Section 422.164(d)(2) required notice-and-comment rulemaking ......... 8

    C.  Section 1395hh(a)(2) independently called for notice-and-comment rulemaking................................................................. 15

    D.  The no-callbacks rule is substantively arbitrary ................................ 22

II.  The silent call should have been invalidated ............................................. 24

Conclusion...................................................................................... 27

## TABLE OF AUTHORITIES

**Cases**

*Bennett v. Spear*,
520 U.S. 154 (1997).................................................................. 3

*Bimini Superfast Operations LLC v. Winkowski*,
994 F. Supp. 2d 103 (D.D.C. 2014) ................................................ 5

*Bridas SAPIC v. Turkmenistan*,
345 F.3d 347 (5th Cir. 2003) ...................................................... 5

*D&G Holdings v. Becerra*,
22 F.4th 470 (5th Cir. 2022)................................................... 3, 8

*Department of Homeland Security v.*
*Regents of the University of California*,
591 U.S. 1 (2020)..................................................................... 7

*Elevance v. CMS*,
736 F. Supp. 3d 1 (D.D.C. 2024) ................................................11

*Lindquist v. City of Pasadena Texas*,
669 F.3d 225 (5th Cir. 2012) ...................................................... 5

*Michigan v. EPA*,
576 U.S. 743 (2015)................................................................. 7

*National Association for Gun Rights, Inc. v. Garland*,
741 F. Supp. 3d 568 (N.D. Tex. 2024)........................................... 6

*Pacific Shores Subdivision v. U.S. Army Corps of Engineers*,
448 F. Supp. 2d 1 (D.D.C. 2006)................................................. 5

*Reule v. Jackson*,
114 F.4th 360 (5th Cir. 2024) ................................................. 3, 6

*Safe Extensions, Inc. v. FAA*,
509 F.3d 593 (D.C. Cir. 2007) .................................................... 7

iii

## Cases—continued

*Shalala v. Illinois Council on Long Term Care*,
　　529 U.S. 1 (2000) ........................................................ 3

*Sierra Club v. U.S. Fish & Wildlife Service*,
　　245 F.3d 434 (5th Cir. 2001) ...................................... 4

*Stand Up for California! v. U.S. Department of Interior*,
　　315 F. Supp. 3d 289 (D.D.C. 2018) ............................12

*Texas v. United States*,
　　40 F.4th 205 (5th Cir. 2022)...................................... 25

*Trenton Threatened Skies v. FAA*,
　　90 F.4th 122 (3d Cir. 2024) ........................................ 6

*U.S. Steel Corp. v. U.S. EPA*,
　　595 F.2d 207 (5th Cir. 1979) ...................................... 4

*United States v. Johnson*,
　　632 F.3d 912 (5th Cir. 2011)...................................... 4

*UnitedHealthcare Benefits of Texas v. CMS*,
　　2024 WL 4870771 (E.D. Tex. 2024).............................. 24, 25, 26

## Statutes, regulations, and treatises

42 U.S.C.
　　§ 1395hh(a)...................................................... 12, 13
　　§ 1395hh(a)(2) ...............................................*passim*
　　§ 1395w-23(a)(1)(B)(i) ...................................... 19
　　§ 1395w-23(b)................................................... 10
　　§ 1395w-23(b)(1)(B) ........................................ 19
　　§ 1395w-23(b)(2) ...........................................14, 21
　　§ 1395w-23(n) ................................................. 19
　　§ 1395w-23(o)(1) ............................................. 19
　　§ 1395w-23(o)(3)(A) ......................................... 19
　　§ 1395w-24(b)(1)(C)(v) ...................................... 20

**Statutes, regulations, and treatises—continued**

42 U.S.C.—continued
   § 1395w-28(i)(1)(B) ..............................................................17
   § 1395w-28(f)(8)(B)(iii)(I) ....................................................17
   § 1395w-28(g)(1) ..................................................................17
   § 1395w-28(g)(2) ..................................................................17
   § 1395x ................................................................................18

42 C.F.R.
   § 422.2 ...........................................................................17, 20
   § 422.111(h)(1)(iii) .......................................................11, 12, 13
   § 422.164............................................................................. 9
   § 422.164(d) ............................................................ 9, 12, 15, 20
   § 422.164(d)(1) ......................................................... 9, 10, 13, 14
   § 422.164(d)(1)(ii) ............................................................... 8
   § 422.164(d)(2)....................................................................*passim*
   § 422.260 ........................................................................... 7
   § 422.266(a)(2)(ii)............................................................. 20

76 Fed. Reg. 21432, 21502-03 (Apr. 15, 2011) ................................11

82 Fed. Reg. 56336, 56386 (Nov. 28, 2017)....................................12

83 Fed. Reg. 16440, 16534 (Apr. 16, 2018) ..............................*passim*

86 Fed. Reg. 5864, 6006 (Jan. 19, 2021) ................................. 11, 13

3 Admin. L. & Prac. § 8:27 .............................................. 7

**INTRODUCTION**

We showed in the opening brief that the no-callbacks rule is unlawful because it was adopted without notice-and-comment rulemaking and is arbitrary and capricious on its own terms. The agency's two principal responses are both, tellingly, efforts to dodge the merits. First, it says (at 22) that "there is no evidence in the administrative record linking the no-callback policy to Humana's failure to successfully resolve the test calls here" and therefore "there is no basis for this Court to consider the lawfulness of the no-callback policy." Second, it insists (at 32-37) that Humana "forfeited" its notice-and-comment argument under 42 C.F.R. § 422.164(d)(2) by offering only a "bare citation to the regulation in its summary-judgment briefing."

Those are genuinely bewildering arguments. CMS itself stated, repeatedly and in the plainest terms possible, that it denied Humana's objections during administrative review *because of* the no-callbacks policy. Nothing more is required to demonstrate causation or the factual "basis for this Court to consider the lawfulness of the no-callback policy." CMS Br. 22. For its part, Humana was crystal clear in the briefing below that it was relying on 42 C.F.R. § 422.164(d)(2) as direct support for its notice-and-comment claim, citing and discussing the provision eight times, including in response to CMS's own citation to the provision equally as many times. *See especially* ROA.1274-1275. CMS's contrary contentions simply blink reality.

1

On the merits, CMS fares no better. Section 422.164(d)(2) plainly applies to the no-callbacks rule and required notice-and-comment. That conclusion is confirmed by Section 1395hh(a)(2) itself—the Star Ratings govern QBPs, which are an embedded element of the MA payment methodology. CMS's contrary arguments are not serious ones. Nor are its rejoinders concerning the substantive arbitrariness of the no-callbacks rule or the deficiencies in the agency's treatment of the silent call. Reversal is in order.

## ARGUMENT

### I. THE NO-CALLBACKS RULE WAS UNLAWFULLY ADOPTED WITHOUT NOTICE-AND-COMMENT RULEMAKING

#### A. The no-callbacks rule determined the outcome of Humana's appeal with respect to D0900533 or D1100955

We start where CMS starts, with causation. CMS asserts (at 21) that "Humana's litigation argument that the no-callback policy somehow caused it to fail the test calls rests entirely on the Sanders Declaration." This is impermissible, according to CMS (*id.*), because "Humana never submitted this declaration to the agency during the administrative process and it is not part of the administrative record." CMS appears to acknowledge (at 22) that Humana may rely on the declaration "to establish its standing" but implies (*id.*) that the question of whether the no-callback rule "caused" CMS to score the calls as unsuccessful is a merits issue on which there is no evidence for Humana to rely. That is wrong in every possible way.

2

**1.** To start, the Sanders declaration is unnecessary to establish causation. CMS's argument on this point is really an argument concerning traceability under the Article III standing framework. *See Reule v. Jackson*, 114 F.4th 360, 367 (5th Cir. 2024) (the "traceability element of standing" is the rule that "a plaintiff must establish that there is 'a causal connection between the injury and the conduct complained of'") (quoting *Bennett v. Spear*, 520 U.S. 154, 167 (1997)). When it comes to traceability in challenges to agency action, it is settled that once a regulated entity "present[s] [a] matter to the agency" for decision, it may later "contest in court the lawfulness of any regulation or statute upon which an agency determination depends." *D&G Holdings v. Becerra*, 22 F.4th 470, 475 (5th Cir. 2022) (quoting *Shalala v. Illinois Council on Long Term Care*, 529 U.S. 1, 23 (2000)).

That resolves the causation issue here, wholly apart from the Sanders Declaration. CMS rejected Humana's protests concerning calls D1100955 and D0900533 during administrative review for a singular reason: "CMS does not allow callbacks from the plan as all questions should be answered in a single call." ROA.740, ROA.729. CMS admits this openly, noting that, "although Humana had suggested [in the plan preview period] that it has a 'procedure to obtain the phone number of the prospective member and then to call them back,'" CMS rejected that position *because* it "'does not allow

callbacks from the plan as all questions should be answered in a single call.'" CMS Br. 14-15 (quoting ROA.729) (alteration incorporated).

Even framing CMS's causation defense as a merits issue (which CMS has never actually done), it would at most raise the question of whether CMS's invocation of the no-callbacks rule was "prejudicial" or instead "harmless" to Humana. But on that point, the standard is essentially the same as traceability: "Agency mistakes constitute harmless error" in an administrative review case "only where they 'clearly had no bearing on the procedure used or the substance of decision reached.'" *Sierra Club v. U.S. Fish & Wildlife Service*, 245 F.3d 434, 444 (5th Cir. 2001) (quoting *U.S. Steel Corp. v. U.S. EPA*, 595 F.2d 207, 215 (5th Cir. 1979)); *accord United States v. Johnson*, 632 F.3d 912, 930 (5th Cir. 2011) (an agency error is harmless and "not prejudicial only when it is one that clearly had no bearing on the procedure used or the substance of decision reached") (cleaned up).

CMS cannot show that the no-callbacks rule "clearly had no bearing" on the outcome below. Once again, the no-callbacks rule was the sole explanation it gave for rejecting Humana's objection. ROA.729, ROA.740. We have made these points before (*e.g.*, ROA.1269), but CMS declines a response.

**2.** The facts demonstrating traceability and prejudice are clear on the face of the parties' communications reproduced in the record. *See* ROA.721-743; ROA.1073-1094; *Bimini Superfast Operations LLC v. Winkowski*, 994

F. Supp. 2d 103, 106 (D.D.C. 2014) (holding that "the administrative record properly includes all documents that were 'directly or indirectly considered,'" including "email correspondence") (quoting *Pacific Shores Subdivision v. U.S. Army Corps of Engineers*, 448 F. Supp. 2d 1, 4 (D.D.C. 2006)). Even if CMS's own explicit rationale were not enough to establish traceability and prejudice (as surely it is), the explanations given by Humana officials leave no doubt on the topic. *See, e.g.*, ROA.722, ROA.1090. [1]

CMS asserts in passing in a footnote near the end of its brief (at 54 n.13) that "[t]his Court should reject Humana's argument that unsworn 'written statements of senior Humana officials submitted to the agency' constitute evidence," but it does not develop argument to support the point. "Arguments that are insufficiently addressed in the body of the brief . . . are waived." *Lindquist v. City of Pasadena Texas*, 669 F.3d 225, 240 n.48 (5th Cir. 2012) (quoting *Bridas SAPIC v. Turkmenistan*, 345 F.3d 347, 356 n.7 (5th Cir. 2003)). The Court therefore can take the point as conceded.

**3.** Regardless, any remaining doubt (there should be none) is resolved by the Sanders Declaration. *See* ROA.166-168. As we noted in the opening brief (at 45), the declaration shows beyond question that the no-callbacks rule

---

[1]  CMS's "gotcha!" assertion (at 20) that we conceded calls D0900533 and D1100955 were correctly scored unsuccessful is wrong. Both in the district court (ROA.137) and here (at 49), we addressed what would happen if a call center failed to call back *if CMS allowed callbacks*, which it does not do.

"adversely affected" Humana's Star Ratings. CMS objects (at 21) on the ground that "Humana never submitted this declaration to the agency during the administrative process," concluding that it therefore "is not part of the administrative record." But that is both irrelevant and wrong.

It is ***irrelevant*** because in agency review cases like this, "consideration of extra-record evidence is appropriate to evaluate standing." *National Association for Gun Rights, Inc. v. Garland*, 741 F. Supp. 3d 568, 600 (N.D. Tex. 2024); *accord, e.g.*, *Trenton Threatened Skies v. FAA*, 90 F.4th 122, 130 (3d Cir. 2024). Again, causation in this context is really just traceability in the Article III sense, which is a core standing question. *Reule*, 114 F.4th at 367. CMS does not deny this basic point.

CMS implies (at 22) that we addressed causation in the opening brief as a matter of the merits. As CMS now sees it (at 23), the supposed lack of causation evidence in the record "permitted the agency to make the decision that it did." But the agency did not base its decision below on any supposed lack of causation evidence. It did not, for example, respond to Humana's objections by asserting that "It is immaterial that we have a no-callbacks rule, because you, Humana, have not satisfied us that you actually would have called back if callbacks were allowed." On the contrary, CMS accepted Humana's policies and practices as they were described in the company's correspondence and responded with a straightforward, tough-luck message: The agency "does not

allow callbacks." ROA.740. That forecloses this point for CMS, for "judicial review of agency action . . . is limited to 'the grounds that the agency invoked when it took the action.'" *Department of Homeland Security v. Regents of the University of California*, 591 U.S. 1, 20 (2020) (quoting *Michigan v. EPA*, 576 U.S. 743, 748 (2015)).

We have made the post-hoc rationalization point repeatedly (*e.g.*, ROA. 1267-1268), but CMS has never once has addressed it. Nor did the district court resolve it. That alone is a basis for reversal.

In any event, CMS is ***wrong*** because the Sanders Declaration was before the agency during CMS's administrative review. It was submitted to the agency in February 2025 in the first district-court litigation, before Humana briefed its administrative appeal. That suffices, for an "informal" agency action like agency review under 42 C.F.R. § 422.260 "is not subject to a closed, well-defined record" (3 Admin. L. & Prac. § 8:27) and embraces "any evidence [the agency] had before it when it made its decision" (*Safe Extensions, Inc. v. FAA*, 509 F.3d 593, 604 (D.C. Cir. 2007)). An agency cannot, in an informal administrative review process, deliberately blinder itself to relevant materials that were before it at the relevant time. *See Safe Extensions*, 509 F.3d at 604–06.

But the Court need not reach these issues. All it needs to hold is that when a regulated entity "present[s] [a] matter to the agency" for decision, the

entity may later "contest in court the lawfulness of any [rule] upon which [the] agency determination depends." *D&G Holdings*, 22 F.4th at 475. That rule is commonsense and settled, and it resolves CMS's causation argument.

**B.    Section 422.164(d)(2) required notice-and-comment rulemaking**

Humana's lead challenge to the no-callbacks rule is its claim that the rule had to be, but was not, promulgated via notice-and-comment rulemaking. *See* ROA.33-35 (¶¶ 85, 91). Although that position finds support in multiple sources, it is most easily resolved by reference to 42 C.F.R. § 422.164(d)(2): The no-callbacks rule is a "substantive" update to the Foreign Language Interpreter Measure within the meaning of that provision, and it therefore had to proceed "through rulemaking" according to its terms.

CMS devotes (at 49) just one paragraph to the merits of this point, asserting that the no-callbacks rule is not substantive because it "does not change the numerator or the denominator of the Foreign Language Interpreter Availability measure." As CMS sees it (*id.*), "with or without the policy, the measure is calculated as the number of successful calls divided by the number of total calls." But that ignores that the rule dictates *which* calls count as successful. It thus "impact[s]" (42 C.F.R. § 422.164(d)(1)(ii)) the measure's numerator. And CMS does not respond to our showing (at 28) that the rule "change[s] the nature of the measure" and affects its "methodology or specifications." 83 Fed. Reg. 16440, 16534 (Apr. 16, 2018).

Rather than meaningfully address the merits of our Section 422.164-(d)(2) argument, CMS attempts to dodge it, on two distinct grounds. Neither is remotely persuasive.

**1.** CMS argues first (at 32-33) that "Humana never alleged that CMS's adoption of the no-callback policy failed to comply with 42 C.F.R. § 422.164(d)" and asserts that "Humana's summary-judgment briefing cited § 422.164 [only] in passing" and "did not argue that the agency violated that regulation." It thus defends (at 36-37) the district court's failure to address Section 422.164(d)(2) on the view that "Humana never argued to the district court that the agency had violated that regulation."

That perplexing assertion has no basis in reality. In the opposition to CMS's summary judgment cross-motion, Humana argued clear as day:

> Again, 42 C.F.R. § 422.164(d)(2) expressly requires the adoption of "substantive" measure changes "through rulemaking." And consistent with that requirement, CMS has previously acknowledged that it "must propose *through rulemaking* any changes to the methodology for calculating the ratings, the addition of new measures, and substantive measure changes." The no-callbacks rule is a substantive amendment of the eight-minute rule, which defines the regulatory standard that the Accuracy and Accessibility Study measures for purposes of the Star Ratings. Notice and comment therefore was required.
>
> As a fallback, CMS points to 42 C.F.R. § 422.164(d)(1), which establishes an informal process for "non-substantive updates" to Star Ratings measures. As we demonstrated in the opening brief, however, the no-callbacks rule is not "non-substantive" within the meaning of that provision, and it therefore does not apply.

9

> Instead, § 422.164(d)(2) applies—and it calls for notice-and-comment rulemaking. CMS does not join issue with our contention on this point, and the point is therefore conceded.

ROA.1274-1275 (citations omitted). That argument hardly could have been plainer: Section 422.164(d)(2) applies to the no-callbacks rule, requiring notice-and-comment rulemaking. In contrast, Section 422.164(d)(1) does *not* apply, and thus the sub-regulatory process that it calls for, pursuant to 42 U.S.C. § 1395w-23(b), "is manifestly not the appropriate vehicle for notifying the public and taking comment on the no-callbacks rule." ROA.134.

Despite this clear argument, the district court did not devote a word to resolving it. Like CMS here, it acted as though Humana never made the point. But Humana *did* make the point, and CMS's contrary assertion simply misrepresents the course of the parties' briefing.

**2.** CMS next argues (at 37-38) that "Humana nowhere established *when* or *how* CMS adopted the no-callback policy," noting that "the Federal Register says nothing about the no-callback policy." That is another puzzling contention. The crux of Humana's claim is that the no-callbacks rule was supposed to have been promulgated by notice-and-comment rulemaking, but it was not. That being so, of course it does not appear in the Federal Register; that's our whole point.

Nor is there a relevant question when the no-callbacks rule was adopted. As we demonstrated below (ROA.1274), the no-callbacks rule is an effective

amendment of the standard set by 42 C.F.R. § 422.111(h)(1)(iii), which speci-fies that an MAO's call center must make foreign language interpreters avail-able to incoming customer-service callers "within 8 minutes of [the caller] reaching the customer service representative." The eight-minute requirement was adopted in 2021. *See* 86 Fed. Reg. 5864, 6006 (Jan. 19, 2021). Neces-sarily some time thereafter, CMS began enforcing eight-minute rule with a no-callbacks amendment, requiring compliance with the eight-minute rule *in a single call*. The no-callbacks rule, which analytically is an amendment of the eight-minute rule, thus could not have come any earlier than 2021.

None of this "contradict[s] the record on appeal regarding the history of the Interpreter Availability measure," as CMS wrongly asserts (at 40). We explained in the opening brief (at 11-12) that CMS initially "used its authority to disseminate information to beneficiaries as the basis for developing and publicly posting the 5-star ratings system." *Elevance v. CMS*, 736 F. Supp. 3d 1, 6 (D.D.C. 2024). But it later recognized the need for notice-and-comment rulemaking under Section 1395hh(a)(2), which it then undertook in 2017-2018 for all Star Ratings measures. *Id.* The point is an important one, so we reiterate the relevant sequence of events:

- In 2011, CMS adopted 42 C.F.R. § 422.111(h)(1)(iii), establishing the obligation to make foreign language interpreters available at MAO customer service call centers. *See* 76 Fed. Reg. 21432, 21502-03 (Apr. 15, 2011). The regulation did not at the time specify an eight-minute rule or a no-callbacks rule.

11

- Through 2018, CMS tested for compliance with Section 422.111-(h)(1)(iii) using an informal measure under the guidance-driven Star Ratings system, again not subject to a formal eight-minute rule or no-callbacks rule.

- In 2018, CMS promulgated 42 C.F.R. § 422.164(d), formally recognizing its obligation to use notice-and-comment rulemaking for changes to the Star Ratings measures. 83 Fed. Reg. at 16534. The provision distinguished between *substantive* and *non-substantive* changes, thus faithfully implementing the requirements of Section 1395hh(a), which calls for rulemaking for any agency action that "establishes or changes a *substantive legal standard* governing . . . the payment for services . . . under this subchapter." 42 U.S.C. § 1395hh(a)(2) (emphasis added).

- Also in 2018, CMS—properly relying on Section 1395hh(a) for its rulemaking authority—adopted the Star Ratings measures using notice-and-comment procedures. *See* 83 Fed. Reg. at 16543. The preamble to the final rule incorporated the agency's extant "Star Ratings Technical Notes" (*id.* at 16538), which described the Foreign Language Interpreter Measure as testing the percent of time that "foreign language interpretation [services] were available when needed" by call-center callers. *See* Opening Br. 29. The measure still did not include an eight-minute rule or a no-callbacks rule.[2]

---

[2]    CMS correctly notes (at 39-40) that the 2018 Star Ratings Technical Notes are not in the administrative record, but that is irrelevant. The annual Star Ratings Technical Notes (*e.g.*, ROA.817-1030) are expressly incorporated into the Federal Register (*see* 83 Fed. Reg. at 16538; 82 Fed. Reg. 56336, 56386 (Nov. 28, 2017) (proposed rule)), and we cited them only to establish the state of the law (really, the state of the Foreign Language Interpreter Measure) in 2018. Even if "guidance documents are not part of the administrative record" in the technical sense, litigants still are free to "cit[e] relevant excerpts from [the guidance documents] in their merits briefing," just as they may cite any other public agency pronouncements. *Stand Up for California! v. U.S. Department of Interior*, 315 F. Supp. 3d 289, 295 (D.D.C. 2018).

- Finally, in 2021, CMS—again citing its rulemaking obligations under Section 1395hh(a)—amended Section 422.111(h)(1)(iii), adding the eight-minute rule for the first time. *See* 86 Fed. Reg. at 6006. Immediately thereafter, it updated the Technical Notes for the Accuracy & Accessibility Study (ROA.779, ROA.783) to conform the Foreign Language Interpreter Measure to the new eight-minute rule, which it did because the measure tests compliance with the regulation and thus had to be updated to reflect changes to the regulation itself.[3]

This sequence of events is fully consistent with both our legal theory and the regulatory background that supports it: If CMS had wanted to implement a no-callbacks rule, it either could have amended the Foreign Language Interpreter Measure directly, using notice-and-comment rulemaking as expressly required by 42 C.F.R. § 422.164(d)(2). Or it could have amended Section 422.111(h)(1)(iii), with which the Accuracy & Accessibility Study tests compliance, in turn updating the study and measure to conform to any properly promulgated changes to Section 422.111(h)(1)(iii). But CMS did neither of those things. It instead adopted the no-callbacks rule without notice to the public in any form. That was a violation of law.

---

[3]   We note for clarity's sake that the "Medicare Part C & D Call Center Monitoring Accuracy and Accessibility Study Technical Notes" (ROA.778), which CMS dubs (at 10) the Call Center Technical Notes, are distinct from the "Medicare 2025 Part C & D Star Ratings Technical Notes" (ROA.817). CMS incorporates only the global Star Ratings Technical Notes into the Federal Register. *See* 83 Fed. Reg. at 16520, 16524 (incorporating and linking to the Star Ratings Technical Notes only). It does not give notice of or take comments on the Call Center Technical Notes.

**3.** We explained that CMS's fallback argument also gives it no cover. In the first lawsuit, the agency had argued that Section 422.164(d)(1), not (d)(2), applies to the no-callbacks rule, allowing it to promulgate the rule through the sub-regulatory procedure specified at 42 U.S.C. § 1395w-23(b)(2). *See, e.g.*, ROA.133 (citing and characterizing CMS's arguments from the first suit). We explained that paragraph (d)(1) was a distraction, because even supposing that (d)(1) applied to the no-callbacks rule in theory, CMS did not use the Section 1395w-23(b)(2) process to promulgate the rule.

In rejecting that argument, the district court offered a *non sequitur*: "Humana is incorrect because the no-callback policy is clear from the guidance." ROA.1326. The premise of that non-answer seemed to be that, if the no-callbacks rule was clear on the face of the Accessibility Study Technical Notes (ROA.778-809), the agency's informal (d)(1) obligation would be satisfied. But that is manifestly wrong. As we explained in the opening brief (at 35)—and CMS does not disagree—Section 422.164(d)(1) requires using the sub-regulatory notice process established by Section 1395w-23(b)(2). That process requires CMS to distribute an "Advanced Notice of Methodological Changes" each year, detailing non-substantive, administrative updates to its capitation-rate policies. Never has CMS sought comment on the no-callbacks rule through such a notice. So regardless of whether the rule was

14

clearly stated in the Accessibility Study Technical Notes (ROA.778-809), it falls short even of (d)(1)'s notice requirements and is unlawful.

CMS does not join issue on the point, short of admitting that we are right and the district court was wrong. *See* CMS Br. 49 ("CMS did not adopt the no-callback policy via § 422.164(d)"). It instead focuses (at 42-44) on our own fallback to the fallback, that the no-callbacks rule is *not* clear from the Call Center Technical Notes. On that front, we stand by the argument from the opening brief (at 36-37) and decline to address CMS's word-splicing and logic-chopping rejoinders. That is not because we lack confidence in our arguments; indeed, the district court's *sua sponte* textual errors virtually speak for themselves. Rather, it is because nothing here turns on it in light of CMS's now-express concession (at 49) that it never satisfied the requirement set out by either Section 422.164(d)(2) *or* (d)(1).

## C.　Section 1395hh(a)(2) independently called for notice-and-comment rulemaking

CMS devotes most of its notice-and-comment argument (at 24-32) to its contention that 42 U.S.C. § 1395hh(a)(2) does not require formal rulemaking for the adoption of, repeal of, or changes to Star Ratings measures. That is an awkward argument given that Section 422.164(d)(2) implements Section 1395hh(a)(2) in relevant part and does precisely that. It thus comes as no surprise that CMS's textual arguments are meritless.

15

**1.a.** As the opening brief explained (at 32), the Star Ratings govern quality bonus payments, which—according to CMS itself—are "a component of the payment methodology for MA and MA-PD plans." 83 Fed. Reg. at 16524. It follows that the Star Ratings measures govern "payment for services" within the meaning of Section 1395hh(a)(2).

CMS's litigation-inspired response is shocking. According to its brief before this Court (at 26-27), the term "services" as it is used in Section 1395hh(a)(2) categorically does not cover supplemental benefits under Medicare Advantage or prescription drug benefits under Part D. Pointing to the word's appearance "more than six hundred times" throughout the definitions section of Medicare statute, CMS reasons that the word "services" only ever includes services under Parts A and B (traditional Medicare), and never services under Part C (Medicare Advantage) or Part D (the Medicare prescription drug benefit). Because QBPs may be used only to provide "supplemental benefits" under Parts C or D, and because "supplemental benefits" are not "benefits under original Medicare," it follows that "MAOs are . . . forbidden from using quality bonus payments to pay for 'services' as Medicare defines that term." CMS BR. 26-27.

That position is downright irresponsible for an agency whose very name—the Centers for Medicare and Medicaid *Services*—contains the term at issue here. The "services" provided to MA enrollees pursuant to the terms of

an MA plan, including supplemental services beyond those required by traditional Medicare, assuredly are "services . . . under this subchapter" within the meaning of 42 U.S.C. § 1395hh(a)(2) and the Medicare statute broadly.

That conclusion is reflected in myriad provisions of the Medicare statute. For instance, in establishing administrative appeal requirements for dual-eligible MA plans that furnish both Medicare and Medicaid coverage, the statute refers to such plans as "cover[ing] items *or services* under this part," meaning Part C, "or under subchapter XIX," meaning Medicaid. 42 U.S.C. § 1395w-28(f)(8)(B)(iii)(I) (emphasis added). Another provision addresses coverage by "a Medicare Advantage senior housing facility plan," which is a kind of supplemental coverage plan available only under MA and not traditional Medicare. *Id.* § 1395w-28(g)(1). The statute refers to such a plan as providing "services." *Id.* § 1395w-28(g)(2). In later addressing program integrity and fraud-and-abuse, the statute refers to "[p]roviders of services" with respect to "MA plans under this part," meaning Part C, "and prescription drug plans under part D." *Id.* § 1395w-28(i)(1)(B). We could go on, but the point is clear: MA plans under Part C and prescription-drug plans under Part D provide "services" under the Medicare statute.

CMS's regulations confirm the same. In 42 C.F.R. § 422.2—the definitions section applicable to Part 42 of the Code of Federal Regulations—CMS defines "mandatory supplemental benefits" as "health care *services* not

17

covered by Medicare that an MA enrollee must accept or purchase as part of an MA plan." It similarly defines "optional supplemental benefits" as "health *services* not covered by Medicare that are purchased at the option of the MA enrollee." More generally, CMS defines "benefits" as "health care *services* that are intended to maintain or improve the health status of enrollees." Yet it distinguishes "benefits" from "basic benefits," which are limited to "Part A and Part B benefits." Again, we could go on, but that is enough to make the point: Part C and Part D benefits, including those that go beyond Part A and Part B benefits, cover "services" within the meaning of the Medicare program writ large, including Section 1395hh(a)(2).

CMS cites (at 26-27) 42 U.S.C. § 1395x for its contrary position, but that provision does not support its argument. Section 1395x does not define the word "services" at all. And if its 600+ references to "services" suggests anything, it's that all healthcare services covered by Medicare under "this subchapter" (including Parts C and D) fall within the term's scope. Nothing suggests an intent to limit or constrain the meaning of "services" for purposes of 1395hh(a)(2). Nor is there any conceivable policy reason why Congress would have intended such a distinction. Section 1395hh(a)(2)'s notice-and-comment duty applies to all "substantive legal standard[s] governing . . . the payment for services . . . under this subchapter," without limitation for the Part under which the services are provided. Period.

**b.** Offering an unhelpful analogy to employees paying plumbers with holiday bonuses, CMS also resists (at 28-29) the notion the QBPs are "payments for services." It seems to suggest that "bonuses" are only ever bounties for jobs well done, never remuneration for services delivered.

That is not how Medicare Advantage and QBPs work. As we explained in the opening brief (6-7), MA plans receive per-enrollee monthly *payments* from CMS to cover *services* to their enrollees. CMS determines a plan's monthly payment by comparing the plan's "bid" (its estimated cost of providing covered services) to a "benchmark" (the maximum risk-adjusted sum CMS will pay for coverage). 42 U.S.C. § 1395w-23(b)(1)(B), (n). When the bid is below the benchmark, CMS pays the MAO its bid and returns a share of the difference between the bid and the benchmark as a "rebate." This rebate is the amount that an MOA must use to provide additional benefits or cost reductions. *Id.* §§ 1395w-23(a)(1)(B)(i), (E); 1395w-24(b)(1)(C). The rebate is not a performance bonus; every MAO receives it by design.

Star Ratings produce additional payments to MAOs, known as QBPs, only by adjusting the parameters for determining these rebates. First, Star Ratings dictate the benchmark: If an MA plan receives 4.0 Stars or higher, the benchmark goes up, increasing the rebate. *Id.* § 1395w-23(o)(1), (3)(A). Second, they dictate the share of the difference returned as the rebate: If an MA plan receives 4.5 Star Rating or higher, the share returned is 70% of the

difference between the bid and benchmark, rather than 65% (as for plans with between 3.5 and 4.5 Stars) or 50% (as for plans with below 3.5 Stars). 42 U.S.C. § 1395w-24(b)(1)(C)(v); 42 C.F.R. § 422.266(a)(2)(ii).

These adjustments to the MA payment methodology constitute the so-called QBPs, which is how and why the Star Ratings and QBPs are inextricably bound up with the system by which MAOs are paid under the MA program. *See* 83 Fed. Reg. at 16524 (QBPs are "a component of the payment methodology for MA and MA-PD plans"). So if the rules for determining a plan's benchmark and rebate share are "substantive legal standard[s] governing . . . the payment for services" under the MA program—as surely they are—then substantive changes to the Star Ratings measures must go through notice and comment under Section 1395hh(a)(2). Which is doubtless is why CMS promulgated 42 C.F.R. § 422.164(d) in the first place.

CMS is also wrong to imply (at 27) that increased rebate payments used by an MA plan for premium and cost-sharing reductions are not "payments for services." Under 42 C.F.R. § 422.2, "optional" supplemental benefits are those paid for by the plan on the enrollee's behalf using premiums or by the enrollee directly using a copay or coinsurance. When a plan uses QBPs to reduce premiums or cost-share obligations, it effectively converts "optional" supplemental benefits into "mandatory" ones. *See id.* Payments used for such reductions therefore *are* for "services."

20

**2.** CMS says (at 30-32) that our position proves too much, and that its adoption would mean that risk-adjusted capitation rates would also have to go through notice and comment because they "reflect what the government would expect to pay providers for the services they furnish to the Medicare beneficiary." This, according to CMS, would mean that 42 U.S.C. § 1395w-23(b)(2)—which specifies a sub-regulatory notice process for annual changes to capitation rates—is superfluous.

Wrong. Accepting that capitation rates have a bearing on "payments for services," they are not "substantive legal standard[s]" under Section 1395hh-(a)(2). When CMS sets a capitation rate using Section 1395w-23(b)(2)'s sub-regulatory notice process, it is simply announcing the rates to be paid for services. The no-callbacks rule, by contrast, is a substantive legal *rule* that governs the Star Ratings *methodology* and thus QBPs.

**3.** The Star Ratings also dictate plan eligibility under the MA program because an MA plan with multiple years of sub-3.0 Stars may be summarily terminated from the program. *See* Opening Br. 32-33. CMS says (at 30) that this does not "govern[] . . . the eligibility of [MAOs] to furnish . . . services or benefits under this subchapter" (42 U.S.C. § 1395hh(a)(2)) because the regulations only "vest the agency with discretion about whether to terminate a persistently low-performing contract." But that does not change the baseline fact that a plan cannot summarily be terminated it has 3.0 Stars or above,

whereas it can be if it does not. Thus, the Star Ratings govern a plan's eligibility to continue in the MA program, and Section 1395hh(a)(2) applies.

### D.    The no-callbacks rule is substantively arbitrary

We showed (Opening Br. 45-49) that the no-callbacks rule not only was adopted unlawfully without notice and comment but also is substantively arbitrary. CMS's response here (at 49-52) is consistent with its position and the district court's brush-off reasoning (ROA.1327) below: "The Star Ratings are designed to facilitate beneficiaries' comparisons among plans," and anyone would "agree that a call center that does not drop calls and provides answers on a single call provides better customer service." The premise is that that any measure may rationally take into account any factor that an ordinary person would think indicative of "better customer service," no matter how unrelated the factor may be to the measure's specific purpose.

That reasoning, taken to its logical conclusion, would deprive individual Star Ratings measures of any standalone meaning, reducing the notice-and-comment process under 42 C.F.R. § 422.164(d)(2) to an empty gesture. CMS's own rulemaking history shows that when CMS engages in notice-and-comment rulemaking to promulgate a substantive change to a particular Star Ratings *measure*, it must demonstrate the changes are rationally related to the purpose of the *measure* being changed—not to the Star Ratings as a whole or to some other measure not being changed. And here, not even CMS denies that

there is no rational relationship between the availability of an interpreter in under eight minutes and a no-callbacks rule.

We also argued (at 49) that it is arbitrary to prevent MAOs from using industry best practices to rectify call disconnections.[4] CMS faults Humana (at 51) for lacking evidence to support this point. But that's a Catch-22 if ever there were one. It is CMS, not Humana, that declined to hold the no-callbacks rule out for notice and comment, as it was required to do. It is hardly Humana's fault for not developing a complete comment-making record in a rulemaking process that never took place.

Finally, CMS asserts (at 51-52) that the no-callbacks rule does not irrationally double-weight call disconnections, noting that the call-disconnection measure "is a display measure only" and does not factor into the Star Ratings. That is a distinction without a difference. The point is that when CMS wishes to measure call disconnections, it creates a measure for that purpose—no matter whether that measure factors into a Star Ratings score or is instead displayed independently to would-be enrollees on its website. To count call disconnections again, in the distinct context of interpreter availability, is to count call disconnections twice, without explanation—and once with a

---

[4]   As an aside, CMS mischaracterizes the facts when it asserts (at 3) that "Humana hung up on [the] test callers." *Accord* CMS Br. 1, 4, 19, 21, 56. The evidence was that "both calls disconnected due to third-party internet connection interruptions outside of Humana's control." ROA.1063, 1067.

measure that is *meant* to measure call disconnection and another that is *not*. That is a textbook example of arbitrary and capricious agency action.

## II.   THE SILENT CALL SHOULD HAVE BEEN INVALIDATED

Concerning the silent call, CMS's position (at 55) is that it was enough for the Hearing Officer to find that an "attempt[] w[as] validly made" by a CMS secret shopper to speak with a CSR, but that the test call was "not completed as outlined in the Technical Notes" because the "Call Center disconnected [the] call."

That is not responsive to the crux of Humana's claim, which is that a secret shopper does not "validly" make an attempt to test interpreter availability without actually *saying something* and ultimately posing a question in a foreign language, as required by the Call Center Technical Notes. *See* Opening Br. 51-52. That was Judge Kernodle's conclusion in *UnitedHealthcare Benefits of Texas v. CMS*, 2024 WL 4870771 (E.D. Tex. 2024): When a call "connects," as the record shows happened here (ROA.717), "the test call necessarily move[s] to phase three" of the test-call script, and "the test caller [must ask] the introductory question contemplated at phase three of the call." 2024 WL 4870771, at *4. The "burden" is not on "the CSR to engage with the test caller *before* the introductory question is asked." *Id.*

CMS now says (at 55) that *UnitedHealthcare* case is inapposite because the MAO there "introduced evidence—a call recording—showing that the call

24

connected to a live representative." But neither CMS during the plan preview period (ROA.717) nor the Hearing Officer on informal review (ROA.161) rejected Humana's objection on the ground that Humana failed to provide evidence that the call "connected." In fact, CMS's explanation was the exact opposite: It found that the "raw data and call log confirm that the CMS interviewer dialed the correct number *and connected with the plan*" but reasoned that "it is not unusual for the interviewer to remain silent while waiting for a CSR." ROA.717 (emphasis added).

The agency thus did exactly what Judge Kernodle said it may not: It put "the burden to the CSR to engage with the test caller before the introductory question [was] asked." 2024 WL 4870771, at *4. The Hearing Officer said as much in plain terms: She rejected Humana's appeal because there was no evidence that Humana's CSR was "*speaking* at any point," and "both the Humana representative and the CMS caller were silent for the duration of the call." ROA.161 (emphasis added). In other words, the Hearing Officer faulted the Humana CSR for failing "to engage with the test caller before the introductory question [was] asked." 2024 WL 4870771, at *4. That puts this case on all fours with *UnitedHealthcare*. At no point did the Hearing Officer find that there was insufficient evidence of a "connection."

The district court's finding "that there is no proof that Humana *connected* the caller to a live customer service representative" (ROA.1329 (em-

phasis added)) is therefore a new and unsupported rationale not relied upon by CMS or the Hearing Officer in the administrative review process. Indeed, it is one at odds with the agency's own finding in the plan preview period. ROA.717. That is not permissible. "'An agency's action must be upheld, if at all, on the basis articulated by the agency itself,' not reasons developed post hoc." *Texas v. United States*, 40 F.4th 205, 226 (5th Cir. 2022) (cleaned up). Again, the evidence in the record, including the parties' correspondence and CMS's own explanation during the plan preview period, is that "the CMS interviewer . . . connected with the plan." ROA.717.

In sum, CMS's justification for scoring the call unsuccessful in the administrative review process effectively "requir[ed] [the Humana CSR] to engage with the test caller before hearing an introductory question. *United-Healthcare*, 2024 WL 4870771, at *4. As we explained in the opening brief (at 55), however—notably, without dispute from CMS—the "guidelines [do not] impose such a burden." *UnitedHealthcare*, 2024 WL 4870771, at *4. "Rather, the guidelines contemplate only that the caller will ask the introductory question and then measure whether the CSR answers it appropriately" through an interpreter timely joined to the line. *Id.* If a CMS test caller remains silent, the caller fails to test the measure according to the guidelines, and CMS cannot score a call unsuccessful. *Id.*

## CONCLUSION

The Court should reverse and remand with instructions to declare that the no-callbacks policy is unlawful, declare that each of the challenged call scores is arbitrary and capricious, set aside Humana's 2025 Star Ratings for all adversely affected contracts, and remand the matter to CMS for recalculation of Humana's 2025 Star Ratings and quality bonus payments.

April 17, 2026                           Respectfully submitted,

                                         /s/ *Michael B. Kimberly*

                                         MICHAEL B. KIMBERLY
                                             *Winston & Strawn LLP*
                                             *1901 L Street NW*
                                             *Washington, DC 20036*
                                             *(202) 282-5096*

                                         EDWARD A. DAY
                                             *Winston & Strawn LLP*
                                             *300 N. LaSalle Drive*
                                             *Chicago, IL 60654*
                                             *(312) 558-8106*

                                         *Counsel for Plaintiffs-Appellants*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 32 and Fifth Circuit Rule 32, undersigned counsel certifies that this brief:

(i) complies with the type-volume limitation of Rule 32(a)(7)(B) because it contains 6,434 words, including footnotes and excluding the parts of the brief exempted by Rule 32(f); and

(ii)    complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it is typeset in Century Supra font in 14 points.

Dated: April 17, 2026                    /s/ *Michael B. Kimberly*